**ROBERT E. DERECKTOR OF RHODE ISLAND, INC., et al., Plaintiffs,**

and

**Marine Power & Equipment Company Inc., Intervenor,**

v.

**Neil E. GOLDSCHMIDT, et al., Defendants,**

and

**Tacoma Boatbuilding Co., Intervenor.**

Civ. A. No. 80–0445.

United States District Court, D. Rhode Island.

June 17, 1981.

Philip W. Noel, Coffey, McGovern, Noel & Novogroski, Providence, R. I., for plaintiffs.

Mark Evens, Dept. of Justice, Washington, D. C., for Neil E. Goldschmidt, et al.

Harry W. Asquith, Providence, R. I., for Tacoma Boatbuilding Co.

Cary Coen, John A. Murphy, Providence, R. I., and Philip H. Harris, Washington, D. C., for Marine Power & Equipment Co., Inc.

## OPINION

FRANCIS J. BOYLE, District Judge.

The issue in this action is the validity of an award to Plaintiffs, Robert E. Derecktor of Rhode Island, Inc. and Rhode Island Ship Builders, Inc., [hereinafter Plaintiff], by Defendant Coast Guard of a contract to construct nine 270 foot, 1700 ton medium endurance cutters and to provide spare parts at a bid price of $349,000,000.00.

Plaintiff brought the action because the Coast Guard initially determined both it as the lowest bidder and Intervenor Marine Power as the second lowest bidder to be

nonresponsive bidders and awarded the contract to Intervenor Tacoma Boatbuilding, the third lowest bidder for a price of $391,882,517 on August 28, 1980. By Opinion in *Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt*, 506 F.Supp. 1059 (D.R.I.1980), this Court declared the Coast Guard's determination of nonresponsiveness to be invalid, and, on January 15, 1981, the Coast Guard awarded the contract to Plaintiff. Intervenors Marine Power and Tacoma [hereinafter sometimes Intervenors] now contend that award to Plaintiff is invalid, is contrary to procurement regulations and that Plaintiff is not a responsible bidder.

Plaintiff, Robert E. Derecktor of Rhode Island, Inc., is a Rhode Island corporation and is the sublessee of a lease from the United States Navy to the State of Rhode Island of land and facilities located on Narragansett Bay in the State of Rhode Island. The land and facilities were formerly used as a part of the United States Navy Base, Newport, Rhode Island, to support activities of the Atlantic Fleet and, upon withdrawal of most of the Navy ships from Newport, the land and facilities were determined to be surplus to the Navy's present needs. The lease with options is for a total term of thirty years from January 1, 1979, and may be terminated by the Navy in the event of a National Emergency. Options to renew are nullified if the Navy determines that renewal is not in the interest of national defense. Plaintiff is presently conducting a small shipbuilding and repair facility on the property. The use under the lease and sublease is limited to shipbuilding and activities in support of other marine industries. Plaintiff Rhode Island Shipbuilders, Inc. is an inactive corporation initially formed to conduct joint ventures in marine activities. All of the stock of both corporations is owned by Robert E. Derecktor. Derecktor also owns and operates a small shipbuilding facility through a New York corporation at Mamaroneck, New York, and is the owner of substantial stock in a corporation which operates a small shipyard and repair facility located in Fort Lauderdale, Florida.

Intervenor Marine Power & Equipment Company, Inc., is a corporation which operates a shipyard located at Seattle in the State of Washington. Intervenor Tacoma Boatbuilding Co. is a corporation which also operates a shipyard in the State of Washington. It is presently building four cutters of the same type involved in the procurement which is the subject of this action. The four cutters being constructed by Tacoma are referred to as Class A cutters and those nine cutters involved in this action are referred to as Class B cutters.

Defendant Coast Guard requested bids to construct much needed cutters to replace outmoded vessels presently in use, to be opened in June, 1980. Six bids were submitted. The bids were:

| | |
|---|---|
| Derecktor | $349,530,719 |
| Marine | $380,854,103 |
| Tacoma | $391,882,517 |
| Avondale Shipyards, Inc. | $407,496,208 |
| Alabama Dry Dock & Shipbuilding Co. | $417,752,891 |
| Bath Iron Works Corporation | $427,037,689 |

When the Coast Guard determined the Derecktor bid to be responsive, it was then necessary in accord with procurement regulations to determine if Derecktor was also a responsible bidder. 41 C.F.R. § 1–2.407–2. A preaward survey team was appointed by the contracting officer. Captain James E. Grabb was appointed Chairman, and the other members were Captain H. E. Fallon, Commander J. D. Vitkauskas, Lieutenant Commander J. W. Hall, Lieutenant A. S. Gracewski, Chief Warrant Officer C. W. Meyer, Mr. C. R. Singman and Ms. S. L. Hoglind.

Captain Grabb is a graduate of the Coast Guard Academy and earned a Masters Degree in Naval Architecture and Marine Engineering from Massachusetts Institute of Technology, and a professional degree in Naval Engineering. He completed a course in quality assurance at Ohio State University and courses in quality assurance in naval shipyards, management of defense acquisition and advanced defense acquisition management. His practical experience included two summers as a participant in programs at the Boston Navy Yard and the Bethlehem Steel Shipyard at Quincy, Massachu-

setts, while a student at the Massachusetts Institute of Technology; three years in charge of repair, maintenance and alteration of all Coast vessels in the Fifth Coast Guard District; service as Commanding Officer, Resident Inspection Office, Lorraine, Ohio, which included contract administration and inspection for the construction of seven medium endurance cutters at a commercial shipyard; responsibility for the design of Polar class icebreakers, and he was Chief of the Procurement Division, Coast Guard Headquarters from 1976 to 1979. In 1979, he became Chief of the Major Acquisitions Staff and has the responsibility to oversee the planning, development and execution of acquisition projects for the ships that the Coast Guard buys. He had not served on a preaward survey team before. As Chief of the Procurement Division for three years he reviewed all preaward surveys that the Coast Guard performed during that period and his approval was required before a contract could be awarded.

Captain Fallon is a 1957 graduate of the Coast Guard Academy with a Masters Degree in Naval Architecture from the University of Michigan. He is currently Chief of the Naval Engineering Division, responsible for the design, construction and repair of all Coast Guard ships. He has served as Manager of ships inventory control point and as a Project Manager of the Coast Guard Yard and as Project Manager for Polar class icebreaker design and construction.

Lieutenant Commander Hall, the electronics representative, had been involved with the electronics of the 270 foot medium endurance cutters for a number of years. Commander Vitkauskas had from ten to fourteen years experience overseeing the safety aspects of commercial vessels and was chief of the shipbuilding branch at Coast Guard Headquarters. Lieutenant Gracewski is a graduate of Massachusetts Institute of Technology and Project Officer of the 270 foot medium endurance Class A cutters under construction by Tacoma. Chief Warrant Officer Meyer had a seagoing background and was assigned to the Quality Assurance Division of the Coast Guard. Charles Singman was a contract negotiator and was involved in the preparation of the Invitation For Bid. Ms. Hoglind was a cost price analyst who had been employed by the Coast Guard for six months at the time of the survey, and who had prior experience at the defense contract administration service.

Except for Chief Warrant Officer Meyer and Ms. Hoglind, each of the other members of the team was involved in the supervision of construction of four Class A cutters by Tacoma.

The survey team first met on June 11, 1980. Captain Fallon testified that it started with "a negative attitude." In addition to an Appointment Letter, the team was given copies of Federal Procurement Regulations, Defense Acquisition Regulations, a portion of Department of Transportation Regulations and a Department of Defense preaward survey form number 1524, Appendix K to the Defense Acquisition Regulations (DAR) and Navy Regulations referred to as SACAM. The team understood that it was to comply with the Federal Procurement Regulations and that the other regulations and the Form 1524 were given to them for guidance only. The purpose of the survey was to determine whether or not Plaintiff could obtain the necessary resources to construct the cutters, in view of the fact that it had not previously performed a contract of this magnitude, did not have either personnel or facilities necessary to perform the contract and because it had but recently acquired the use of a site in Coddington Cove, on the west shore of Aquidneck Island, upon property which had become surplus from the United States Naval Base, Newport, Rhode Island.

The team forwarded a telegraphic request to Plaintiff of the information it would require for the survey and arrived at the site on Monday, June 16. The survey information was obtained over a period of five days, and the team returned to Washington, D. C. on Friday, June 21. In general, the survey team investigated the Plaintiff's ability to obtain plant facilities and

equipment, personnel and financing for the performance of the contract. The specific categories studied were Production Capability, Plant Facilities and Equipment, Financial Capability, Purchasing and Subcontracting, Accounting System, Quality Assurance Capability, Transportation, Plant Safety, Security, Labor Resource, Performance Record, Ability to Meet Required Schedule and Management.

In sum, the survey award team's report submitted on July 10, 1980, found that Plaintiff did not then have the capability to meet the contract requirements since it had little production capability and virtually no management or administrative capability at the time of the survey. In spite of Plaintiff's lack of facilities and personnel, however, "the Survey Team unanimously determined that Robert E. Derecktor of Rhode Island, Inc. has adequately provided acceptable evidence of his [sic] ability to obtain equipment, facilities and personnel needed to comply with the contract requirements." The Chairman, Captain Grabb, stated:

"I concur that the evidence is acceptable and I recommend that award be to Robert E. Derecktor, Inc. of Rhode Island [sic] providing R. E. Derecktor [sic] demonstrates to your satisfaction that:

a. A suitable line of credit is available from the consortium headed by the Hospital Trust Bank. A commitment from the bank was promised but never received.

b. The drydock LIONEL FORSYTH is suitable for launching the 270 WMEC. Evidence to satisfy this requirement should be in the form of a written commitment by R. E. Derecktor [sic] to accomplish whatever repairs are deemed necessary by an independent competent marine surveyor.

c. The current strike will be satisfactorily resolved."

(Pertinent portions of report as set forth verbatim in the margin.) *

Following receipt of the preaward survey report the Coast Guard upheld Tacoma's protest that the bid forms of both Plaintiff and Marine were not responsive and awarded the contract to Tacoma. This Court determined that both bid forms were responsive to the solicitation on December 24, 1980. The Coast Guard then proceeded to update the preaward survey report concerning Plaintiff's ability to perform the contract, determined that there was a commitment to a line of credit in the amount of fifteen million dollars for the benefit of Plaintiff, that a survey had found the drydock suitable for launching the cutters contingent upon certain repairs which Plaintiff agreed to accomplish, and that the strike of Plaintiff's plant had been resolved. The so-called "update" material was received by Captain Grabb on January 5, 1981, and he returned to the site at Newport, Rhode Island, on January 13. He learned that Plaintiff had made plans to enlarge its construction facilities, and had secured Navy approval required for the expansion. He was also informed that the Navy had made a Candidate Environmental Impact Statement [hereinafter sometimes CEIS] in 1978 which had determined that the submission of a Draft Environmental Impact Statement was not required for the establishment of a medium size shipyard at Coddington Cove by the Plaintiff and that it was considered that compliance with the National Environmental Policy Act [hereinafter NEPA][1] had been effected in connection with the proposed lease of the Coddington Cove site as a medium size shipyard. The Candidate Environmental Impact Statement was initiated because of Plaintiff's plans to construct a shipyard and the CEIS considered the effect of the establishment on a long term basis of a shipyard by the Plaintiff which would involve the construction of ships up to a length of 300 feet and the use of a floating drydock.

Captain Grabb reported to the contracting officer on January 14, 1981, that he was "convinced that Plaintiff was a responsible bidder." He was satisfied that the Navy had the responsibility to comply with the

---

* APPENDIX

1. 42 U.S.C. § 4321 *et seq.*

requirements of NEPA and that it had done so. In addition the Coast Guard had also completed its own study of the impact on the environment of the addition of nine cutters to its equipment and had determined that there would be no effect in view of the fact that they would replace vessels already in service.

The contracting officer, after reviewing a cash flow projection submitted by Marine's expert relating to Plaintiff's performance of the contract, awarded the contract to Plaintiff on January 15, 1981. Thereupon, both Marine and Tacoma sought an order of this Court enjoining performance of the contract pending a determination of the responsibility of Derecktor, and a determination of whether the Coast Guard had complied with applicable laws and regulations. On February 3, 1981, this Court enjoined the Coast Guard from executing the contract until the conclusion of trial on the merits and on March 2, 1981, the Court ordered the injunction to continue until decision.

The Court heard testimony and has reviewed those extensive portions of depositions designated by the parties and the voluminous exhibits submitted and has considered the extensive and well-prepared memoranda submitted by counsel.

In general, Intervenors argue that the action of the Contracting officer in his award of the contract to Plaintiff on January 15, 1981, was irrational or unreasonable in that this action was the award of the largest Coast Guard contract in its history and was made to Plaintiff solely on the basis of its perceived estimate of Plaintiff's ability to perform the contract. Central to this argument is the fact that Plaintiff does not now have a shipyard capable of performing the contract and has not previously built ships of the size and number required by the contract. Intervenors question Plaintiff's financial ability and assert that

Plaintiff is not capable of performing the contract within either the bid price or the time limitations stated in the contract. Additionally, Intervenors contend that performance of the contract will be delayed because the Coast Guard first must comply with the requirements of NEPA before awarding the contract.

Specifically, Intervenors argue that the award was in fact made to two companies, Robert E. Derecktor of Rhode Island, Inc. and Rhode Island Shipbuilders, Inc.; that Rhode Island Shipbuilders, Inc. has not been determined to be a responsible bidder, and, therefore, that the award is invalid. They argue that although the bid submitted by Plaintiff in June of 1980 provided for delivery of the first completed vessel in thirty months, the Coast Guard permitted the bid to be modified to comply with bid specifications after submission but before acceptance to require delivery of the first vessel in thirty-six months.[2]

Both Intervenors vigorously argue that there was no rational basis for the award because it was made upon insufficient data, on the basis of incorrect assumptions and based upon unverified decisions.

Intervenors presented testimony from two experts: Ted Frost, a C.P.A., and Marvin Miller, a retired Government Procurement Specialist. Apart from the basis for their opinions, the testimony of Mr. Frost is seriously flawed by the fact that he and his firm performed accounting services for Intervenor Marine Power for the past eleven years, and the testimony of Mr. Miller was similarly suspect because of his almost concurrent efforts to arrange a procurement contract for Plaintiff which could not be simultaneously accomplished. Mr. Frost's ultimate opinion was that Plaintiff's and the Coast Guard's cash flow projections were not made on a "worst case" basis and that in fact a proper cash flow analysis

---

2. This change occurred because government furnished equipment, which the Coast Guard is required to furnish to the contractor, would not be available in time to complete the first vessel in less than thirty-six months, and the bid specifications required delivery of the first vessel within thirty-six months. The alignment was clearly justified. If a delay in completion occurred because of the late delivery of government furnished equipment, the Coast Guard might be subject to additional costs.

would require not only twice the amount of financing available to Plaintiff but that the type of financing available to Plaintiff, based upon advances of up to eighty percent of receivables, was inappropriate. Mr. Miller testified, in sum, that the contracting officer did not have sufficient data available to him to determine that Plaintiff was a responsible contractor.

Intervenors contend on the basis of Mr. Frost's testimony, that the Coast Guard erred with respect to the time of receipt of payment for work performed under the contract with respect to all vessels to be constructed after the first vessel with the result that at month thirty-six of the performance of the contract based on the Coast Guard figures and assumptions, Plaintiff would need almost thirty million dollars of financing, while it had only inadequately provided for a little more than fifteen million dollars. It also contended, based upon Mr. Frost's testimony, that the cash shortage which would exist at month thirty-six would be not less than thirty million dollars and actually could amount to almost forty million dollars. Based upon the fact that Plaintiff's line of credit amounts to fifteen million dollars, Intervenors contend that it will be financially impossible for Plaintiff to perform the contract and that the Plaintiff will default with consequent delay and damages to the Coast Guard. Plaintiff, on the other hand, contends that Mr. Frost did not take into consideration the possibility that Plaintiff's vendors would require payment from Plaintiff only after Plaintiff received payment from the Coast Guard.

A cash flow projection for a project to be accomplished is at best an informed prediction, the accuracy of which can be finally determined only after the project has been completed. Having in mind that it is a prediction and the fact that the Coast Guard personnel who participated in the survey has already had some actual experience with the ongoing construction expenses of its Class A 270 foot medium endurance cutters by Intervenor Tacoma, and that Intervenor's witness, Mr. Frost, not only has a bias but is completely lacking experience of the specific type possessed by the Coast Guard personnel, it is more likely than not that the Coast Guard is not in error in its prediction of cash flow. Intervenors have failed to prove that a financial debacle is likely to result so that it can be said that the determination of the Coast Guard represents either a serious mistake or bad business judgment, much less an unreasonable or irrational determination.

When bids are advertised, "[a]ward shall be made . . . to that responsible bidder whose bid, conforming to the Invitation For Bids, will be most advantageous to the Government, price and other factors considered." 41 U.S.C. § 253(b). The General Services Administration [hereinafter GSA] has issued Federal Procurement Regulations [hereinafter FPR][3] that set forth standards for determining responsibility and specifically require the contracting officer to make an affirmative determination that the prospective contractor is responsible before a contract is awarded. 41 C.F.R. § 1–1.1204–1. Both Marine Power and Tacoma seek to have this Court overturn the affirmative determination of responsibility made by the Coast Guard contracting officer in awarding the contract to Plaintiff. Before addressing this issue, it is necessary to consider whether judicial review of an affirmative determination of responsibility is appropriate and, if so, the standard of review to be applied.

The Intervenors seek relief pursuant to the Administrative Procedure Act [hereinafter APA or Act]. Three provisions of the Act are relevant to the discussion of whether or not the decision may be reviewed. First, the Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. Secondly, the Act provides that agency actions are subject to judicial review "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed

---

3. 41 C.F.R. § 1–1000 *et seq.* (1980).

to agency discretion by law." 5 U.S.C. § 701(a)(1) and (2). Finally, the Act provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (D) without observance of procedure required by law; ...." 5 U.S.C. § 706(2)(A) and (D). Plaintiff has argued vigorously that an affirmative determination of contractor responsibility is an agency action totally committed to agency discretion by law within the meaning of Section 10 of the APA and that such a determination is not reviewable.[4] Moreover, the Plaintiff asserts that the First Circuit Court has established the test for reviewability in *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970). Intervenors Marine Power and Tacoma, on the other hand, noting that courts have frequently reviewed the actions of federal agencies taken in the course of procurements, have contended that "the committed to agency discretion" exception is inapplicable to this action.[5]

■ There is a strong presumption in favor of judicial review which is overcome only by clear and convincing evidence of contrary legislative intent. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967); *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970). The exception to review for agency action committed to agency discretion is very narrow, applying only "in those rare instances where 'statutes are drawn in such broad

terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). The issue of whether an affirmative determination of responsibility is a matter totally committed to agency discretion within the meaning of Section 10 of the APA has not been squarely addressed by the courts. Although many courts have recognized the discretion reposed in contracting officers making responsibility determinations, none have held such determinations nonreviewable under the APA.

Whether or not the *Hahn* test applies to this action is an extraordinarily close question. *Hahn* involved the statutory authority of the Secretary of HUD to supervise the operation of low and middle-income housing, in part by means of a "regulatory agreement, or otherwise, as to rents, charges and methods of operation ...." 12 U.S.C. § 1715l(d)(3). The agreement is made with the landlord, not the tenant. The Court of Appeals for the First Circuit held that tenants may not have a judicial review of decisions of the agency granting a rent increase because rent increases were matters of agency action—committed to agency discretion by law, within the meaning of Section 10 of the APA. 430 F.2d at 1251. The *Hahn* court based this conclusion upon three considerations: (1) the appropriateness of the issues raised for review by the courts; (2) the need for judicial supervi-

---

4. In support of its contention that this is a matter committed to agency discretion, Dereck-tor argues that the General Accounting Office [hereinafter GAO] refusal in this matter and others to review protests against affirmative determinations of responsibility absent an allegation of bad faith or the existence of objective responsibility criteria in the Invitation For Bid demonstrates that this matter is not appropriate for judicial review. There is no doubt that the GAO possesses great expertise in the area of contract awards. *Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1314 (D.C.Cir.1971); *A. & M. Gregos, Inc. v. Robertory*, 384 F.Supp. 187 (E.D.Pa.1974). GAO decisions on the merits, however, are not binding on the courts. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305 (D.C.Cir.1971). In fact, courts have the

last word. *Wheelabrator Corp. v. Chafee*, supra, at 1316. The GAO remedy is not exclusive, nor is the GAO determination final. *Merriam v. Kunzig*, 476 F.2d 1233, 1242 (3d Cir.), cert. denied sub nom. *Gateway Center Corp. v. Merriam*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973). With even more reason, GAO dismissals not considering the merits of aggrieved bidders protests against affirmative determinations of responsibility are not binding on the courts.

5. Intervenors have cited many procurement cases in support of their contention, including *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971), and *Merriam v. Kunzig*, 476 F.2d 1233 (3d Cir. 1973).

sion to safeguard the interests of the plaintiffs, and (3) the impact of review on the effectiveness of the agency in carrying out its assigned role. *Id.* at 1249.

The plaintiffs in *Hahn* sought a review which would determine whether or not the agency's determination that was specifically authorized by Congress was correct. As to the second of the criteria established in *Hahn*, it was held that plaintiffs were not direct beneficiaries of the housing program and that rents were regulated, but only "in such manner as in the opinion of the Secretary will effectuate the purposes of this section." 12 U.S.C. § 1715l(d)(3). 430 F.2d at 1246. Concerning the third criteria, the court found an impact on agency effectiveness because of the delaying nature of the formalities of review and because review discouraged involvement by the private sector. The court held that the inappropriateness of judicial review, the minimal function of review in protecting the plaintiffs' rights, and the adverse impact of review on agency operations all provide "clear and convincing evidence" that Congress did not intend courts to supervise rent decisions. *Id.* at 1251.

The courts that have permitted judicial intrusion into the procurement process have not essentially concerned themselves with whether or not the agency decision was correct but whether or not the agency decision was correct but whether or not the agency acted legitimately, certainly a more appropriate judicial consideration. There is no question of the direct interest of the parties to this action in assuring that the agency decision was within the authority vested in the agency. In *Hahn*, the court considered a rather specific statutory "carte blanche," given to the Secretary of HUD,[6] and the court held that Congress meant what it said. The FPR, on the other hand, are not outright Congressional grants of authority but are promulgated under the Federal Property and Administrative Services Act of 1949. That Act provides that

"[t]he Administrator shall prescribe such regulations as he deems necessary to effectuate his functions under this Act, and the head of each executive agency shall cause to be issued such orders and directives as such head deems necessary to carry out such regulations." 40 U.S.C. § 486(c). Moreover, the FPR establish a considerable number of benchmarks all of which must be traversed in order to exercise the ultimate decision of whether or not to commit substantial public monies to the acquisition of public property.

Action that creates delay and discouragement of bidders is, of course, undesirable not only from the point of view of the bidders themselves, but more significantly from that of the public. Public procurement for vital government services should proceed expeditiously. Disappointed bidders could develop a "knee jerk" reaction to seek the decision of a court, correcting the alleged "errors" of Government contracting officers. The alternative is equally uninviting; that is, that procurement regulations are what contracting officers say they mean, providing no review whatsoever, in spite of an elaborate scheme of regulations, to be applied to their procurement decisions.

■ Those decisions which have allowed limited excursions into the procurement process have sought an accommodation. They profess considerable latitude for procurement decisions, but not a total dispensation in terms of unfettered determinations, at least to the extent of requiring compliance with the regulatory process. That is to say that they involve not whether the Administration decision is correct, but whether the decision correct or not was arrived at in compliance with the regulatory process. To this extent *Hahn* and the opinions which sanction review can be harmonized. A judicial requirement that the agency comply with the regulatory process safeguards the interest of the public and the parties, and it could be argued with some vigor and conviction that the impact

---

**6.** As noted, Congress authorized the Secretary of HUD to approve mortgagors and supervise their operations "under a regulatory agreement

... in such form and in such manner as in the opinion of the Secretary will effectuate the purpose of this section." 12 U.S.C. § 1715l(d)(3).

of review so limited is likely to provoke more public benefit than the alternative of total abdication. Thus, the Court concludes that *Hahn* does not preclude a limited inquiry.[7]

In reviewing the Coast Guard's determination of Plaintiff's responsibility, the duty of this Court is to "hold unlawful and set aside agency action . . . found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (D) without observance of procedure required by law; . . ." 5 U.S.C. § 706(2)(A) and (D). The District of Columbia Circuit Court first recognized that a frustrated bidder for a Government contract had standing to sue under the APA and to challenge whether the contract was legally awarded in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). The *Scanwell* court observed:

> The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general.'

*Id.* at 864. In *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971), the District of Columbia Circuit Court next considered the approach to be used by courts when an action under *Scanwell* raises highly technical and complex issues of interpretation of procurement regulations. The

*Steinthal* Court remarked that "[i]n the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate . . . action that is illegal must be exercised with restraint. . . ." *Id.* at 1298–99.[8] Thus, the *Steinthal* Court stated that courts should not overturn procurement determinations unless the aggrieved bidder has established that there was no rational basis for the agency's decision and then restated the inquiry as a determination of whether the procurement agency's decision had a reasonable basis. *Id.* at 1301. The *Steinthal* Court admonished that this inquiry must fully consider the discretion "typically accorded officials in the procurement agencies by relevant statutes and regulations." *Id.*

The District of Columbia Circuit Court later restated the inquiry. "[T]hose adversely affected by the award of government contracts," the Court observed, . . . "[bore] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Limited v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973) (footnotes omitted). *Accord, Sun Ship, Inc. v. Hidalgo*, 484 F.Supp. 1356, 1358 (D.D.C.1980); *John W. Danforth Co. v. Veterans Administration*, 461 F.Supp. 1062, 1070 (W.D.N.Y.1978). In *Keco Industries,*

---

7. The First Circuit Court has recognized that *Overton Park, supra,* "sharply limited the scope" of the committed to agency discretion exception. *Adams Nursing Home of Williamstown, Inc. v. Matthews*, 548 F.2d 1077, 1079 n.5 (1st Cir. 1977). Significantly, procurement decisions are governed by complex and extensive regulations which establish requirements. Thus, there are many regulations having the force of law to be applied. Federal Procurement Regulations. 41 C.F.R. § 1–1000 *et seq.* It should also be noted that the *Hahn* analysis retains vitality even after *Overton Park. See, e. g. Colon v. Carter*, 633 F.2d 964, 966–67 (1st Cir. 1980); *Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1043–44 (D.C.Cir. 1979); *SGA Financial Corp. v. United States Small Business Administration*, 509 F.Supp. 392, 398 (D.N.J.1981).

8. The Fifth Circuit Court subsequently noted that the general admonition issued to reviewing courts against engrafting their own ideas of proper procedures upon agencies and interfering in the agency decision making process is especially applicable in government procurement cases. *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1270 (5th Cir. 1978). "This recognition flows from . . . [the] awareness that judges are ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency . . . .' " *Id.* at 1271 (citation omitted).

*Inc. v. United States*, the Court of Claims [9] stated that "[t]he ultimate standard is . . . whether the Government's conduct was arbitrary and capricious toward the bidder-claimant." 492 F.2d 1200, 1203 (Ct.Cl.1974). Enunciating four subsidiary criteria which control all or some of the claims of unsuccessful bidders, the *Keco* Court first noted that subjective bad faith on the part of procuring officials generally warrants recovery of bid preparation costs. *Id.* The *Keco* Court also stated that proof that there was no 'reasonable basis' for the administrative decision will often suffice. *Id.* at 1203–04. Thirdly, the Court of Claims observed that the degree of proof of error required for recovery usually relates to the amount of discretion committed to the procurement officials by applicable statutes and regulations. *Id.* at 1204. Finally, "proven violation of applicable statutes or regulations," the *Keco* Court remarked, "can, but need not necessarily be a ground for recovery." *Id.* The *Keco* Court noted, furthermore, that application of these four criteria depends upon the type of Governmental error and whether that error occurred with respect to the bids of the claimant or to that of a competitor. *Id.* Thus, it is clear that the *Keco* Court criteria embrace the *Steinthal* and *Kentron Hawaii, Limited* tests and principles.

In *Tidewater Management Services, Inc. v. United States* the Court of Claims noted that subjective bad faith on the part of procuring officials is proof that no reasonable basis existed for the award of the contract to another. 573 F.2d 65, 67 (Ct.Cl. 1978). Courts have sometimes equated entirely unreasonable action with conduct motivated by subjective bad faith. *Old Dominion Dairy v. Secretary of Defense*, 631 F.2d 953, 960 (D.C.Cir.1980) (citing *Keco Industries, Inc. v. United States*); *Bur-*

*roughs Corp. v. United States*, 617 F.2d 590, 597 (Ct.Cl.1980).

Some courts have stated that the absence of a rational basis may be demonstrated by a clear and prejudicial violation of applicable statutes or regulations in the procurement procedure. *General Electric Co. v. Kreps*, 456 F.Supp. 468, 472 (D.D.C.1978) (quoting *Kentron Hawaii, Limited v. Warner*). *See also Tidewater Management Services, Inc. v. United States*, 573 F.2d at 67. Other courts, however, have treated proof of statutory and regulatory violations as a separate consideration from that which analyzes whether a rational basis exists. *E.g., Kentron Hawaii, Limited v. Warner*, 480 F.2d 1166 (D.C.Cir.1973).[10]

■ Thus, arbitrary and capricious government action may be demonstrated by proof that no reasonable basis existed for the award of the contract to another. *Tidewater Management Services, Inc. v. United States*, 573 F.2d at 67. *Accord, Excavation Construction, Inc. v. United States*, 494 F.2d 1289, 1290 (Ct.Cl.1974). *M. Steinthal & Co. v. Seamans, supra*, at 1301. Both a clear and prejudicial violation of the relevant statutes and regulations or subjective bad faith on the part of the governmental official demonstrate a lack of a reasonable basis. The issue remains somewhat open, however, as to what proof satisfies the lack of a reasonable basis standard absent a showing of subjective bad faith or a clear violation of relevant statutes and regulations. The *Keco* Court has stated unequivocally that simple negligence will not suffice.

The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid when that omission amounts to simple negligence, is not a sufficient showing of arbitrary or

---

**9.** Court of Claims opinions are particularly helpful because that court has more frequently dealt with the issue of bidder responsibility in the context of claims of disappointed bidders for reimbursement of bid preparation costs.

**10.** At least one circuit court has ruled that even when an aggrieved bidder demonstrates that there was no reasonable basis for the agency's decision, a showing of clear illegality may be

imposed on the challenging bidder. *Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir. 1979); *see Allis-Chalmers Corp. v. Friedkin*, 481 F.Supp. 1256, 1267 (M.D.Pa.1980) (applying *Sea-Land* illegality test to determine that a preliminary injunction should not issue). *Contra Keco Industries, Inc. v. United States*, 492 F.2d at 1204.

capricious conduct to warrant recovery of bid preparation expenses. The Government's duty to exercise care in evaluating the 'price and other factors' of a bid runs first to the proponent of that bid and to the public and its representatives, and only then to another bidder. The responsibility to the latter is too attenuated to justify assessing damages for simple negligence, especially in light of the broad discretion of the procurement officials in that aspect of the bid process. Moreover, litigation which second-guesses bid determinations, through efforts to show ordinary lack of due care in appraising competing proposals, should not be encouraged where the award was rational and made in good faith. The interference from such suits and their impact upon contracting activities, would exact too great a price in the procurement process.

492 F.2d at 1206–07 (citation omitted).

■ It is well settled, moreover, that contracting officers have wide discretion in determining a bidder's responsibility.[11] *Tidewater Management Services, Inc. v. United States,* 573 F.2d at 73; *Keco Industries, Inc. v. United States,* 492 F.2d at 1205; *See also Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 960 (D.C.Cir.1980) (contracting officers have wide discretion in determining nonresponsibility). As the Court of Claims noted in *Trilon Educational Corp. v. United States,* "responsibility 'determinations are based in large measure on subjective judgments which are not readily susceptible to reasoned review.'" 578 F.2d 1356, 1358 (Ct. Cl.1978) (quoting *Data Test Corp.,* 54 Comp. Gen. 499 (1974)). Nonetheless, such review has not been foreclosed.

■ In summary, therefore, courts may overturn procurement decisions upon a showing of arbitrary and capricious conduct by Government officials. To prove arbitrary and capricious conduct an aggrieved bidder must demonstrate a lack of a reasonable or rational basis for the agency deci-

sion. This requires a showing of more than simple negligence. Either subjective bad faith on the part of the procuring official or a clear and prejudicial violation of relevant statutes and regulations is tantamount to a lack of a reasonable or rational basis.

The burden of successfully disputing a contract award is necessarily a heavy burden. Otherwise, the judgment of courts could be substituted for those of procurement officials, destroying an elaborate and technical procurement process and effectively substituting the decisions reposed by law and regulation in the procurement process in contracting officers with a judicial determination that the Executive Branch of Government could have made "a better deal." Furthermore, as this action so well illustrates, with the strictures of procurement regulations, the decision of who is a responsible bidder is essentially a question of business judgment which any unsuccessful bidder may contest, with consequent delay and cost to the Government. Review of the procurement decision is a task not to be undertaken lightly and a contrary judicial determination should be made only in the clearest case. The possibilities are numerous, once the decision is made, to take a "peek" at the procurement process. Doubtless, procurement decisions are made daily, involving large expenditures by Government agencies. Disappointed bidders would be encouraged to delay and impede procurement contracts in the hope that something will happen to their advantage at the courthouse steps. This type of bargaining is antithetical to the bidding process. If permitted without limitation, the most persuasive argument would be substituted for the lowest responsible price.

Turning to the present controversy, the decision to award this contract was made by a contracting officer who relied heavily upon the recommendations of the survey team. *See* 41 C.F.R. § 1–1.1205–4 (contracting officer shall use preaward survey as aid in determining responsibility). *See*

---

11. The Court of Claims has observed that a contracting officer has greater discretion in a negotiated contract than he has through advertised bidding. *Burroughs Corp. v. United States,* 617 F.2d 590, 597–8 (Ct.Cl.1980).

*also* 41 C.F.R. § 1–1.1205–1 ("contracting officer shall have . . . information sufficient to satisfy himself . . . that prospective contractor meets . . . minimum standards . . . ."). There is not the slightest suggestion of either bad faith on the part of the procuring officials or a clear and prejudicial violation of relevant statutes or regulations. It is true that upon analysis some aspects of the determinations might be subject to debate, particularly since the determination was made on the basis of the ability of the Plaintiff, as yet unproved, to perform the contract. 41 C.F.R. § 1–1.1203–4 (Regulation governing ability to meet certain minimum standards). It is a question of informed judgment whether Plaintiff can create the facilities, provide the personnel and necessary equipment and perform the work within the time and price of its bid. But, in the last analysis, it is a judgment which must be committed to the procuring officials. In this instance, they are not without experience and it is not suggested that they lack the necessary sophistication to make such a determination. The expertise of the survey team relied upon by the contracting officer is not only beyond question, but it has not been questioned.

Turning to specific criticisms by Intervenors, the contention that the award was made to Rhode Island Shipbuilders, Inc., clearly not a responsible bidder, is too technical to merit serious consideration since the award was also made to Robert E. Derecktor of Rhode Island, Inc. The conjunction of Rhode Island Shipbuilders, Inc. and Robert E. Derecktor of Rhode Island, Inc. does not in any way diminish the validity of the responsibility determination concerning Robert E. Derecktor of Rhode Island, Inc. The validity of the award depends only on a finding that there is one responsible bidder.

Intervenors contend that because the analysis of Plaintiff's responsibility depends entirely on Plaintiff's future ability to perform without a present capacity to do so, it must demonstrate the present availability of equipment to be acquired, timely and workable production, management accounting and quality assurance programs, compli-

ance with industry regulations, including OSHA, labor force and the ability to launch completed vessels, and bonding and insurance contracts. Intervenors would have the Court infer from the record that Plaintiff cannot perform the contract within the time and price limitations of the contract. This alleged inability to perform the contract must be inferred because Intervenors have presented no direct evidence in support of their contention.

The principal contrary consideration is that the survey team, composed of the more senior, experienced Coast Guard personnel, came to the opposite conclusion and its recommendation was accepted by the contracting officer. The regulations required that the contracting officer make an affirmative determination that the prospective contractor is responsible with respect to the contract. 41 C.F.R. § 1–1.1204–1(a). The conclusion was reached by the Coast Guard based upon its understanding of the applicable procurement regulations. And, there is no evidence that the Coast Guard did not act in good faith. The Court is thus asked to find a good faith determination of the Coast Guard, based upon expertise and experience, to have been wrong. There is no evidence of either a clear or prejudicial violation of any particular regulation and there is no evidence that any particular applicable regulation was overlooked.

Intervenors are particularly critical of the lack of contracts between Plaintiff and its subcontractors and suppliers. Their argument, in part, is that without agreements in existence at the time of the bid submission, there can be no assurance of timely performance or of price. *See* 41 C.F.R. § 1–1.1203–1 (prospective contractor must be able to comply with required or proposed delivery or performance schedule). There is no direct evidence that Plaintiff cannot perform this contract or that it will default. The contracting officer received evidence which, however incomplete, was acceptable to him and may well have determined that the "normal" requirement for commitment or explicit arrangement was not to be applied in this instance. The regulations do

not require contracts with subcontractors or suppliers as essential to a responsible bid. *See also* 41 C.F.R. § 1–1.1206(a) (determinations of responsibility of prospective subcontractors "generally . . . made by the prospective prime contractor" and prospective prime contractor may be required to (1) provide written evidence regarding responsibility of proposed subcontractors, or (2) demonstrate effective purchasing and subcontracting system"). Intervenors seek to impose too high a degree of certainty in the bidding process which would have all the aspects of the performance of the bid "cast in stone." They would ignore the possibility that a contractor may chose to negotiate with subcontractors and suppliers after the award of the contract, and that the prime contractor of a fixed price contract has the risk of financial loss. Under the award, the contractor is to receive progress payments based upon percentage of completion, as agreed to by the Coast Guard and the prime contractor. The risk to the Government is minimal, since it pays only for what it gets. Thirty-eight percent (38%) of the dollar cost of this contract is to be provided by subcontractors. A substantial portion of these items are to be provided by "sole source" supplier; that is, the Coast Guard has designated the only supplier of the item. These items include electronics and fire control equipment and various items of the propulsion equipment. There is no evidence that even one essential element required by the contract is not available. And, returning to the fundamental finding, which has not been impeached, the Coast Guard is satisfied that the work can be done. The evidence is that the determination to award the contract to Plaintiff is neither arbitrary nor capricious, that it was made in good faith, that the determination did not lack a reasonable or rational basis, and that there was no clear and prejudicial violation of any procurement regulation.

■ Tacoma argues that, in addition to the Federal Procurement Regulations, the procurement regulations of the Department of Transportation, of which the Coast Guard is an agency, also apply. The Code of Federal Regulations provides that Department of Transportation Procurement Regulations implement (expand upon) and supplement (add material for which there is no counterpart in the FPR) the FPR. 41 C.F.R. § 12–1.008(a). The specific provisions upon which Tacoma relies are found at 41 C.F.R. § 12–1.5603—"Guide for on-site evaluation of prospective contractor." It states in part: "This guide is intended to assist in developing the facts to be used for preparing the survey report. It should be used only as a guide, not as a question/answer sheet." The guide suggests lists of names of important potential subcontractors and quoted delivery times as well as lists of supplies of critical components and delivery dates. Tacoma seeks to translate a guide into a mandate, ignoring completely the Coast Guard's actual experience with the construction of the Class A cutters and the further fact that the contracting officer was satisfied that the contract could be performed. This argument might take on substance had there been evidence produced by Tacoma, which itself has some expertise in the construction of 270 foot Medium Endurance Cutters, that the Coast Guard was mistaken in its belief. The failure to produce such testimony demonstrates the total lack of factual substance of this argument. Tacoma, as a bidder itself, is in the curious situation of contending that items are available to it which are not available to Plaintiff. At the very least, an explanation is required in order to question the wisdom of the award to Plaintiff.

Intervenors have raised the argument that a performance bond is required.[12] The FPR provide, however, that when a bid guarantee is required, the IFB shall contain "a statement that a bid guarantee is required with the bid and that identifies details which will enable bidders to determine the amount of the bid guarantee . . . ." 41 C.F.R. § 1–10.103–3(a)(1). The IFB did not require a performance bond.

---

**12.** "Performance bond" means a bond executed in connection with a contract to secure fulfill-ment of all the contractor's obligations under such contract. 41 C.F.R. § 1–10.102–3.

Intervenors also argue that the Coast Guard relied upon the financial resources of the other corporations owned by Robert E. Derecktor in making the award to Derecktor. Although the survey team gathered information concerning two companies solely owned by Robert E. Derecktor, there is nothing in the evidence to show that the Coast Guard relied upon that information as essential to the award.

The FPR provide that "[n]o contract shall be entered into unless all applicable requirements of law, Executive orders and regulations have been met. The term 'regulations' includes those issued by a regulatory agency whether or not incorporated or referenced in the Federal Procurement Regulations." 41 C.F.R. § 1–1.403. Intervenors have argued that NEPA sets forth certain requirements of law with which the Defendant has failed to comply,[13] and, therefore, the award of the contract by the Defendant to the Plaintiff is illegal. Intervenors also contend that the affirmative determination of responsibility was without a rational basis absent consideration of the NEPA requirements. Defendant Coast Guard argues that Intervenors lack standing to raise the NEPA and that any applicable NEPA mandates have been met. The Plaintiff essentially joins in the Coast Guard's arguments and further argues that even if NEPA facially applies to this contract award, NEPA conflicts with the FPR and is, therefore, inapplicable.

Section 102(2)(C) of NEPA as amended provides:

The Congress ... directs that, to the fullest extent possible ... all agencies of the Federal Government shall—

. . . .

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

42 U.S.C. § 4332(2)(C). NEPA's directive has force except when existing law applicable to that agency's operations expressly prohibits compliance or renders compliance impossible. *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma*, 426 U.S. 776, 787–88, 96 S.Ct. 2430, 2437–38, 49 L.Ed.2d 205 (1976).

With respect to their NEPA claim, Intervenors assert that the NEPA issues arise solely because Plaintiff, unlike other prospective bidders, has no shipyard in which to perform the subject contract, and argue that because Derecktor's performance of the contract requires construction of a shipyard at Coddington Cove performance of

---

**13.** Although Intervenor Tacoma did not address the NEPA issue in its post trial memorandum, Tacoma had joined Marine Power in its prehearing memorandum in support of its opposition to the motions to dismiss in which

Marine Power had first raised the NEPA issue. Moreover, counsel for Tacoma indicated at the hearing that it joined in Marine Power's arguments with respect to the environmental issues.

**1100**

the contract has an environmental impact that in turn triggers NEPA. In addition, Intervenors argue that the award of the contract is a major federal action within the meaning of NEPA,[14] that they have standing to raise NEPA arguments, and that both the exception to NEPA and the lead agency[15] doctrine are inapposite.

Asserting that the lease of Coddington Cove and the award of the procurement contract are entirely separate transactions, the Coast Guard and the Plaintiff argue that the awarded contract calls for the construction of nine 270 foot medium size cutters, not a shipyard and that the award of this procurement contract is not federal action at all. The Coast Guard also argues that it had discharged its NEPA responsibility with regard to this procurement contract when it issued a negative declaration concerning the environmental impact of obtaining the nine vessels and that the Navy, as lessor of Coddington Cove, has NEPA responsibility with respect to the construction of a shipyard.

Plaintiff additionally argues that, in any event, NEPA requirements conflict with the FPR due to time commitments for both and must, therefore, give way. *See Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).

The arguments outlined present questions, not all of which need be answered.

In *City and County of San Francisco v. United States*, 443 F.Supp. 1116 (N.D.Cal. 1977), *aff'd* 615 F.2d 498 (9th Cir. 1980), the district court considered a claim by the plaintiff City and County, the disappointed bidder, that the Government had violated NEPA in awarding a lease of Hunter's Point Naval Shipyard to the successful bidder for the lease. 443 F.Supp. at 1125. Specifically, the plaintiff asserted that the lease of the shipyard constituted major federal action that triggered the EIS requirement of NEPA. *Id.* The district court held

that the federal action in *City and County of San Francisco* was the outlease[16] of the shipyard to the successful bidder. *Id.* at 1126.

In the instant case the Plaintiff is the sublessee of a lease from the United States Navy to the State of Rhode Island of land and facilities located on Narragansett Bay in Rhode Island. The use under the lease and sublease is limited to shipbuilding and activities in support of other marine industries. Captain Montoya, U. S. Navy and Director of Environmental Protection & Occupational Safety and Health Division in the office of the Chief of Naval Operations testified that the Navy mandates the preparation of a CEIS whenever a new outlease is created. Captain Montoya further testified that it was his opinion that the Navy considered that it had a continuing responsibility with respect to Coddington Cove, including any kind of environmental impact.

The uncontradicted testimony of Captain Montoya, as well as *City and County of San Francisco, supra,* demonstrate that the Navy was obligated under NEPA to consider the environmental consequences of a proposed "outlease." The evidence demonstrates, moreover, that the Navy fully discharged this responsibility. The proposed use of the leased land at Coddington Cove was for a medium sized shipyard where this Plaintiff would construct ships up to a length of 300 feet. The Navy prepared the CEIS with that specific use in mind. The CEIS was then sent to a review board, charged with the duty of reviewing the CEIS for the purpose of making judgments on the issue of major federal actions, whether a significant impact on the environment will occur and whether the document should be filed as a draft EIS. The review board recommended not filing the CEIS as a draft EIS. Upon receipt of that recommendation, Captain Montoya reviewed ⌐ and accepted the board recom-

---

**14.** 40 C.F.R. § 1508.18 (defining major federal action).

**15.** 40 C.F.R. § 1508.16 (defining lead agency).

**16.** An outlease is an term employed by the Navy when it leases its property to another party.

mendation. Thereafter, Captain Montoya wrote a letter to the originator advising him of the decision and asking him to file the document and advised the Secretary of Defense of the negative declaration.

The Navy, having satisfied itself that an EIS was not required, and having followed prescribed procedures,[17] rendered compliance with NEPA when it assessed in the CEIS the environmental consequences of precisely the type of activity now contemplated by Plaintiff. The Coast Guard is correct in asserting that the "outlease" and the procurement contract are entirely separate transactions. Thus, having recognized the Navy's NEPA obligations with respect to the "outlease" and the proposed use of the land, the only question remaining is whether the Coast Guard held an individual NEPA responsibility with respect to the award of the procurement contract to the Plaintiff.

As noted by the Coast Guard the contract awarded to the Plaintiff calls for the construction of nine medium size cutters, 270 feet long. The Coast Guard is not building a shipyard. It is buying nine completed Coast Guard Cutters. There is no federal agency that is building a shipyard. The agency that leased the property for the construction of a shipyard has met the requirements of NEPA. There is some obvious substance to Plaintiff's argument that if compliance with NEPA was required before the contract award, the Court would be required to consider whether such a requirement could survive alongside the FPR. The very nature of the competitive bidding system requires that bids be left open for short periods of time, for many reasons, including price quotations and delivery schedules.[18] It appears, therefore, that the Coast Guard's NEPA duties, if any, are triggered by the presence of nine new cutters, 270 feet in length. The Coast Guard discharged its duty when it issued a negative declaration.

The issue is not, however, which of the agencies involved are legally responsible to consider environmental impact. The record is that the Coast Guard and its contracting officer had a solid basis for a determination that the requirements of NEPA had already been met and minor recent modifications would be justified by the Navy within a short time. Within the scope of this limited review, nothing more is required.

This Court holds, therefore, that Plaintiff is a responsible bidder and that the award of the procurement contract to Plaintiff is valid and in accord with the procurement regulations. Plaintiff's Motion to Dismiss is denied, and the preliminary injunction entered on February 3, 1981, is vacated and the prayer for permanent injunctive relief is denied.

SO ORDERED.

## APPENDIX

5. Robert E. Derecktor of Rhode Island, Inc. (RED) does not currently have the capability to accomplish the work required to meet the contract requirements. The Rhode Island facility surveyed has very little production capability and virtually no management and administrative capability at this time. In almost all areas examined, existing capabilities are unsatisfactory. As a result, the survey team evaluated the prospective contractor's ability to obtain the necessary resources.

6. The Survey Team inspected the RED facility, and interviewed Mr. Robert Derecktor, key personnel now employed or planned to be employed by Mr. Derecktor, major prospective subcontractors, and local government officials. Mr. Derecktor is a boat/ship builder of long standing and has completed other Coast Guard, government and commercial contracts at another shipyard successfully. However, none of the

---

**17.** The Navy followed the required procedures in accord with its own guidelines as set forth in OPNAV Instruction 6240.3B.

**18.** *See also Natural Resources Defense Council, Inc. v. Tennessee Valley Authority,* 367 F.Supp. 128 (E.D.Tenn.1973), individual impact statement for each term coal contract would conflict with TVA Act.

previous contracts required the productive capacity, logistics, or management expertise as the contract this survey pertains to. Under intense inquiry by the Team, Mr. Derecktor and his very limited staff displayed an adequate understanding of the contract requirements and an ability to assemble the resources (personnel and facility) needed to produce the cutters on time and within the price bid. Their plans both to upgrade the facilities and to provide labor resources are viable.

7. The prospective contractor is currently receiving substantial government help. The property is under sublease from the State of Rhode Island who has a lease with the U. S. Government. The terms are extremely favorable to RED. In addition, he has received a low interest loan from the State of Rhode Island for additional facilities and equipment. The State also plans to operate a training school (CETA) on-site at the shipyard to provide entry level skilled personnel. A similar CETA funded training facility has been used at the Electric Boat plant at Quonset Point where Trident submarines are being fabricated. I was told by Navy personnel that the school is very effective. Governor Garrahy appeared before the Survey Team and pledged full State support should Derecktor be awarded the contract.

8. Derecktor has requested that he be allowed to deliver the first vessel in 36 months rather than the 30 months he proposed with his bid. During the Survey, Derecktor presented evidence showing that 36 months is required.