INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL F-100

v.

UNITED STATES DEPARTMENT OF THE NAVY, NAVAL EDUCATION AND TRAINING CENTER, NEWPORT, RHODE ISLAND.

Civ. A. No. 81-0254.

United States District Court, D. Rhode Island.

April 2, 1982.

Jeffrey J. Teitz, Corcoran, Peckham & Hayes, Newport, R. I., for plaintiff.

Robert L. Gammell, Asst. U. S. Atty., Paul F. Murray, U. S. Atty., Providence, R. I., for defendant.

## OPINION

FRANCIS J. BOYLE, District Judge.

This is a civil action for injunctive and declaratory relief. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1346, 1361, 2201 and 2202, and 5 U.S.C. §§ 701–706. The Plaintiff Union is the exclusive bargaining agent for federal civil service employees who perform firefighting services at the Naval Education and Training Center (NETC), Newport, Rhode Island, pursuant to a collective bargaining agreement between the Union and NETC, effective May 16, 1980. The Union is suing in its own right and on behalf of these employees. The Naval Education and Training Center is a naval installation operated by the United States Department of the Navy (Navy).

In response to a Navy directive of May 17, 1979, NETC undertook a Commercial Industrial Type Activity (CITA) study of firefighting services to determine whether they could be performed more economically by a private contractor. As part of this study, the NETC prepared an in-house estimate to determine the cost for civil service employees to continue performing the services. An Invitation for Bids (IFB) from private contractors was issued on December 1, 1980. The IFB was accompanied by specifications for contract performance.

Eight private contractors submitted bids. The bids were opened on January 8, 1981. They were adjusted, reviewed and analyzed

by the Navy, and compared with NETC's in-house estimate. This analysis revealed that the apparent low bidder was RHK Services, Inc. (RHK), of Columbia, Maryland. All other private bids were higher than NETC's estimate.

On January 15, 1981, the Naval Facilities Engineering Command (NAVFAC), Northern Division, wrote RHK, advising the Company that its bid was "much lower" than the other private bids, and requesting confirmation of the bid price. At the direction of NAVFAC, Northern Division, NETC officials and the Officer-in-Charge of Construction, Naval Activities, Newport, met with representatives of RHK on February 3, 1981, to analyze RHK's bid price. Edward Charette, the NETC official who prepared the specifications accompanying the IFB, attended this meeting. After the meeting, he was of the impression that RHK's bid was inadequate in terms of fringe benefits and staffing requirements.

The staffing requirements for the firefighting contract were set forth in an instruction from the Chief of Naval Operations (OPNAV Instruction). The specifications accompanying the IFB informed contractors that staffing for firefighting services at NETC "must comply with the manpower requirements established in [the OPNAV Instruction]," and further informed them that "NETC has been assigned a fire protection classification of 'A,'" thus directing them to a specific portion of the instruction. This portion of the instruction provided in pertinent part that "[f]our men are considered the minimum on-duty complement required for each in-service fire company ... however, a five-man fire company response may be required at large high value activities such as shipyards, major air stations and Navy industrial complexes where Navy firefighting capability is maintained." The OPNAV Instruction did not, however, state whether NETC was in whole or in part a "high value activity," nor did it inform the bidders how to make such a determination. The OPNAV Instruction was not included in the materials provided to the private bidders along with the IFB, but the IFB informed the contractors that they could address questions concerning "the bidding or any other phase of this specification" to Joseph Tanzi, Contract Specialist, NAVFAC, Northern Division. Mr. Tanzi testified that one of the contractors did request the OPNAV Instruction while preparing its bid.

Subsequent to the meeting on February 3, 1981, RHK filed a bid protest with the General Accounting Office (GAO). In its letter to GAO dated February 9, 1981, RHK complained, *inter alia*, that the IFB "improperly omitted vital *specific* information and instruction to bidders regarding staffing requirements" (emphasis in original).

The director of the contracts division at NAVFAC Headquarters in Virginia, Paul Buonaccorsi, was informed of the GAO protest. He requested a report on the bidding process from NAVFAC, Northern Division, requesting documentation and recommendations so that his office could prepare a response to the protest. On February 19, 1981, NAVFAC, Northern Division, sent Mr. Buonaccorsi this report, which was prepared by Mr. Tanzi.

The report stated that although RHK was the apparent low bidder, RHK had failed to provide for adequate staffing. Moreover, it noted that even with inadequate staffing, RHK could not perform the contract at the bid price because it had failed to compute wages correctly. The report acknowledged that "it would have been more desirable to have included [the OPNAV Instruction] with the bid package," but pointed out that RHK could have obtained the instruction from Mr. Tanzi, as one of the other bidders had done. The report recommended that the RHK bid be rejected.

In the alternative, the report requested authority to cancel the IFB, citing "an ambiguity regarding the staffing requirements." The report noted that the OPNAV Instruction could be interpreted as requiring a minimum of four persons at all fire stations on the base, but that the NETC in-house cost comparison provided for a five-person complement at two of the stations which it regarded to be "high value areas."

In a letter dated March 2, 1981, NAVFAC general counsel William H. Speck informed GAO that NAVFAC "proposes to reject all bids, set forth clear requirements as to manning level and readvertise." As authority for this procedure, Mr. Speck cited the Defense Acquisition Regulations (DAR), 32 C.F.R. §§ 1.100 et seq., which provide that an IFB may be cancelled if "inadequate or ambiguous specifications were cited in the invitation." DAR, 32 C.F.R. § 2–404.1(b)(i). Mr. Speck conceded that this procedure "does have the effect of exposing bids, including the government estimate," but concluded that "manning level is such a material requirement going to the very heart of the life and property saving features of the proposed performance that it constitutes a compelling reason to reject all bids."

Because of the proposal to reject all bids, RHK withdrew its GAO protest. By letter of April 1, 1981, NAVFAC, Northern Division, directed NETC to cancel the original IFB and readvertise within sixty days. NAVFAC stated that it would notify bidders that the IFB was being cancelled because of a "change in Government Requirements,". It also recommended that NETC review the staffing requirements to determine whether "it is essential to have a 5 man complement."

In a telegram received by NAVFAC, Northern Division, on April 8, 1981, NETC requested "urgent reconsideration" of NAVFAC's decision to readvertise. NETC denied that there was an ambiguity in the specifications, asserting that:

Although finite manning requirements were not delineated in the specifications, the solicitation stated clearly that manning for a Class A firefighting activity must comply with [the OPNAV Instruction] (available to all bidders upon request). At issue appears to be whether a four or five-man complement should be used in high value areas. As provided for by [the OPNAV Instruction], that manning option was left to the discretion of each competitive bidder. The government chose to use a five-man complement for two high value areas and accept the higher costs. Each bidder had equal opportunity of choice. Accordingly, the implication that the specifications lacked specificity which could necessitate cancellation of the solicitation is not valid.

In addition, the NETC telegram contended that all private bidders had seen its in-house cost estimate when bids were opened in January. NETC argued that "[t]o readvertise the subject invitation when the confidentiality of the government estimate has been compromised, is tantamount to negating further competitive bidding." Therefore, NETC requested NAVFAC to award the contract to the lowest competent bidder—i.e., NETC—"in order to maintain credibility of the [competitive bidding] process."

In a telegram to NETC dated April 13, 1981, NAVFAC reaffirmed its decision to cancel all bids and readvertise. NAVFAC stated that the private bids and government estimate must be based on the same staffing requirements, and directed NETC to identify more precisely the staffing requirements for the second IFB. NAVFAC concluded that more precise identification "should result in revised bids by all concerned," thus minimizing the adverse effects of exposure of the prior bids.

The second IFB was issued July 7, 1981. The specifications accompanying this IFB require four-person firefighting complements. Fifteen private bids were submitted in response to this IFB. According to Mr. Tanzi, five of these apparently are below the government's in-house estimate. The Navy has not yet awarded a contract on the basis of this solicitation.

The Union initially requested this Court to prevent the Navy from opening the bids received in response to the new IFB, awarding any contract based on the second IFB, or taking any other action that would have the effect of setting aside the cost comparison prepared by NETC in conjunction with the first IFB. In addition, the Union sought to restrain Defendant from retaining a private contractor to perform firefighting services at NETC until May 16, 1983, the expiration date of the collective bargaining agreement between the NETC

and Union civil service employees. Finally, the Union requested that the Court restrain the Navy from retaining a private contractor without first performing a study analyzing "the potential economic effect on employees affected, and ... on the local community and [the] Federal Government," in accordance with P.L. 96–342, Title V, § 502; *see* 10 U.S.C. § 2304 nt.

On August 11, 1981, this Court entered an Order temporarily restraining Defendant from awarding a contract for the performance of firefighting services at NETC to a private contractor. The matter was set for hearing on Plaintiff's Motion for Preliminary Injunction on September 2, 1981. On that date the Court heard the parties on issues of standing and jurisdiction, and continued the restraining order pending a hearing on the merits. Thereafter, this Court heard evidence on the merits and additional argument regarding standing and jurisdiction.

In Count I of its verified complaint, the Union alleges that the Navy's decision to cancel the initial IFB rather than authorize NETC to continue to provide firefighting services through civil service employees according to its in-house estimate was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," and should therefore be set aside pursuant to 5 U.S.C. § 706(2)(A).[1] Plaintiff contends that the Navy did not comply with the competitive bidding procedures mandated by the Armed Services Procurement Act (ASPA), 10 U.S.C. §§ 2301–14, and the Defense Acquisition Regulations (DAR), 32 C.F.R. §§ 1.100 *et seq.*

Throughout these proceedings, the Navy has denied that this Court has jurisdiction

over this claim and has contended that the Plaintiff Union does not have standing to bring this action. Before examining the merits of Plaintiff's claim, it must be determined whether the issues raised in Count I are properly before this Court.

## JURISDICTION

■ As bases for jurisdiction, Plaintiff sets forth, *inter alia*, the Administrative Procedure Act (APA), 5 U.S.C. § 701–706, and 28 U.S.C. § 1331. Defendant argues that the APA is not an independent basis for jurisdiction, citing *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977). This assertion is correct, as far as it goes. The *Sanders* Court also determined, however, that the elimination of the amount-in-controversy requirement of 28 U.S.C. § 1331 for cases brought against "the United States, any agency thereof, or any officer thereof in his official capacity," P.L. 94–574(a) (1976), confers jurisdiction on federal courts to review agency action, "regardless of whether the APA of its own force may serve as a jurisdictional predicate." 430 U.S. at 105, 97 S.Ct. at 984. The instant action, which involves interpretation of a federal statute and its implementing regulations, presents this Court with a federal question sufficient to invoke 28 U.S.C. § 1331.

The *Sanders* Court noted that the jurisdiction of federal courts to review agency decisions is "subject only to preclusion-of-review statutes created or retained by Congress." 430 U.S. at 105, 97 S.Ct. at 984. The APA similarly states that judicial review is the rule with exceptions only when "statutes preclude judicial review ... [or]

---

1. The Union also alleged that the Navy's decision should be set aside because it was "unsupported by substantial evidence." The Administrative Procedure Act (APA) provides that agency action may be set aside if it is found to be "unsupported by substantial evidence *in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.*" 5 U.S.C. § 706(2)(E) (emphasis added). Sections 556 and 557 govern agency rulemaking and adjudication which are required by statute to be "on the record after an opportunity for an agency

hearing." 5 U.S.C. §§ 553(c), 554(a) and (c)(2). The agency determination here was not a "rule" as that term is defined in the APA, 5 U.S.C. § 551(4). Nor does the Armed Services Procurement Act (ASPA), 10 U.S.C. §§ 2301–14, which governs the process by which the Navy is to make decisions to procure services from private contractors, require an agency hearing. Thus, the "unsupported by substantial evidence" test does not apply to this action. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971).

agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1) and (2). The ASPA does not contain a preclusion-of-review provision. The jurisdictional inquiry therefore turns on whether the Navy's decision to cancel the original invitation is "committed to agency discretion."

As this Court noted in *Derecktor v. Goldschmidt*, 516 F.Supp. 1085 (D.R.I.1981), the "committed to agency discretion" exception to judicial review is very narrow, applying only where a statute is drawn in such broad terms that there in effect is "no law to apply." *Id.* at 1092, *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). In this action, however, there is law for the Court to apply to the controversy. The Secretary of the Navy is required to follow the procedures of the ASPA in making procurement contracts. 10 U.S.C. § 2303; *see Hayes International Corp. v. McLucas*, 509 F.2d 247, 254 (5th Cir. 1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (Secretary of the Air Force). Moreover, he must comply with the requirements of the DAR. These regulations have the force and effect of federal law. *United States v. Hangar One, Inc.*, 406 F.Supp. 60, 65 (N.D.Ala.1975), *rev'd on other grounds*, 563 F.2d 1155 (5th Cir. 1977). Thus, although the ASPA provides that "all bids may be rejected if the head of the agency determines that rejection is in the public interest," 10 U.S.C. § 2305(c), this determination must be made in accordance with the regulations.

The regulations provide:

The preservation of the integrity of the competitive bid system dictates that after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.

DAR, 32 C.F.R. § 2–404.1(a). The gist of Plaintiff's argument in Count I is that NETC's was in fact the lowest responsible bid, and thus should have been accepted absent a "compelling reason." Plaintiff's assertion that the Navy's action was arbitrary and capricious can thus be interpreted as a claim that the Navy failed to follow its own regulations; *i.e.*, that there was not in fact a "compelling reason" to cancel the original invitation.

Limited inquiry into an agency's compliance with regulations is proper. As this Court reasoned in *Derecktor*, such an inquiry is an acceptable compromise between judicial abdication of responsibility to review the regulatory process and substitution of a court's views on the merits for those of the agency. 516 F.Supp. at 1093–94. Thus, this Court has jurisdiction to determine whether the Navy complied with the ASPA and DAR.

Two recent cases in which courts have determined that agency decisions to procure services from private contractors were "committed to agency discretion" do not compel a contrary conclusion. In the first, *American Federation of Government Employees v. Hoffmann*, 427 F.Supp. 1048 (N.D.Ala.1976), civil service employees at the Ballistic Missile Defense Systems Command, Department of the Army, contended that the Army violated the DAR, *inter alia*, by entering into private contracts for the performance of systems engineering and technical assistance functions. The Army's decision to enter into private contracts for the performance of these functions was intimately connected with national defense policy and important foreign policy decisions, including strategic arms limitations negotiations with the Soviet Union. *Id.* at 1080. The decision had been made by top military officials and concerned highly sensitive military matters. *Id.* The Court noted that the Major General in charge of the Ballistic Missile Defense Program "in fact testified that converting to in-house performance would have a drastic, disruptive impact on this critical defense program." *Id.* at 1081. These considerations led the Court to conclude that the Army's decision "indeed require[d] the superior knowledge and experience of military professionals," and was committed to agency discretion. *Id.* at 1082.

This Court agrees with the *Hoffmann* Court that "[c]onsideration of how best to perform [a] military mission is left to the discretion of military experts." *Id.* In the instant action, however, the Navy's decision

to issue a second IFB concerns a function which is not inherently "military" and is connected with neither national defense nor foreign policy except tangentially. While a decision to cancel an IFB for a firefighting contract because specifications are ambiguous does require the exercise of reasoned judgment based on procurement regulations, it can hardly be said to involve "military expertise at the highest levels," as did the decision in *Hoffmann*. *Id.* at 1082.

The *Hoffmann* Court recognized that courts have allowed disappointed bidders for government contracts to bring suits concerning "the conduct of the specifically prescribed bidding and award process set forth in [DAR]," but noted that "the facts [in *Hoffmann* did] not involve disappointed bidders or any fairly comparable situation." *Id.* at 1079–80. Plaintiffs in *Hoffmann* did not challenge the private contracts on the basis that the procurement officials did not follow the bidding and award process in the DAR. Instead, plaintiffs claimed that the private contracts were contracts for "personal services," entered into in violation of another section of the DAR, 32 C.F.R. § 22.102.1. *Id.* at 1056. In this action, however, Plaintiff challenges a procurement decision based on a particular section of the "specifically prescribed bidding and award process set forth in [DAR]," 32 C.F.R. § 2.404. As will be developed further in the Court's discussion of Plaintiff's standing to bring this action, this challenge, unlike that in *Hoffmann*, is "fairly comparable" to a disappointed bidder situation.

There is a final important factual distinction between *Hoffmann* and the instant action. Plaintiffs in *Hoffmann* did not claim that they should have been appointed to the positions filled by employees of private contractors, but rather claimed that other civil service employees should have been appointed to these positions. Plaintiffs claimed that they would then have been eligible to compete with these other civil service employees when a reorganization at the Army base later precipitated a reduction-in-force. *Id.* at 1051, 1084. Plaintiffs failed to prove, however, that the functions could have been performed in-house, either at the time the contracts were entered into or at the time of trial, and further failed to prove that they were capable of performing these functions. *Id.* at 1053–55. In this action, by contrast, the employees Plaintiff represents have demonstrated that the firefighting function at NETC can be performed in-house, and in fact has been performed in-house by these very employees. Moreover, Plaintiff has demonstrated that these employees are capable of continuing to perform these services.

The second case, *American Federation of Government Employees (AFGE), Local 1872 v. Stetson*, 86 CCH Lab.Cas. ¶ 33, 819 (D.D. C.1979), bears more factual similarity to this action. Plaintiffs, civil service employees, were challenging a reduction-in-force which resulted from the Air Force's decision to contract out refuse collection services at Shaw Air Force Base. Until the decision was made, these employees, like the civil service employees Plaintiff represents, performed the services in-house. The challenge in *Stetson*, however, was based on the alleged illegality of the contracts under the Service Contract Act (SCA), 41 U.S.C. §§ 351 *et seq.* (1976), Office of Management and Budget (OMB) Circular A–76 and civil service regulations. The Court determined that plaintiffs did not have standing under the SCA because it was meant primarily to benefit employees of private contractors, or under the OMB Circular because it was "intended to . . . aid the exercise of agencies' independent discretion." 86 CCH Lab.Cas. ¶ 33, 819 at 48, 851. Citing *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, the Court found that the discretion vested in agency officials by the Circular was "drawn in such broad terms that 'there [was] no law to apply' " to plaintiffs' challenge, and ruled that the decision was committed to agency discretion.

In Count I, Plaintiff in this action challenges a Navy decision under a statute which, unlike the SCA in *Stetson*, arguably confers benefits on persons whose interest in the competitive bidding process allegedly has been undermined. See discussion of standing, *infra*. Plaintiff also cites the DAR which, unlike the OMB Circular in *Stetson*, have the force and effect of feder-

al law and set forth specific guidelines which the Navy is required to follow in deciding to cancel an Invitation for Bids. DAR, 32 C.F.R. § 2–404.1(b). Both the ASPA and the DAR provide law for this Court to apply to the controversy before it. The *Stetson* decision does not persuade this Court that the Navy's decision is committed to agency discretion. Therefore, the Court finds that Plaintiff's claim in Count I is justiciable.

## STANDING

■ Plaintiff's standing argument derives from cases which have recognized that an unsuccessful bidder for a government contract may challenge the procurement process. *See, e.g., Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260 (5th Cir. 1978); *Merriam v. Kunzig*, 476 F.2d 1233 (3d Cir. 1973), *cert. denied sub nom. Gateway Center Corp. v. Merriam*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Plaintiff asserts that the NETC's in-house estimate was in effect an unsuccessful bid for performance of firefighting services at NETC. Plaintiff contends that because NETC, as an agency of the Navy, will not seek judicial review of the allegedly unlawful decision of NAVFAC, another agency of the Navy, to resolicit bids, it becomes the duty of the Union, as representative of the firefighting civil service employees at NETC, to do so. Plaintiff represents that its members will suffer economic injury if the firefighting contract is awarded to a private company as a result of the resolicitation, and that the interests of its members are within the zone of interests which the ASPA and the DAR are designed to protect. Thus, Plaintiff concludes, it passes the standing test enunciated by the Supreme Court in *Association of Data Process-*

*ing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), which requires a plaintiff to show "injury in fact, economic or otherwise," to pass the "case or controversy" requirement of Article III, and requires as well that the interest a plaintiff seeks to protect be "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* at 152–53, 90 S.Ct. at 829. The *Data Processing* Court recognized that these requirements are encompassed by the APA, which grants standing to a person "aggrieved by agency action within the meaning of a relevant statute." *Id.* at 153, 90 S.Ct. at 829, *citing* 5 U.S.C. § 702.

The Government argues that Union employees may not in fact suffer injury if firefighting services at NETC are contracted out, asserting that the Government will make efforts to find suitable employment for displaced civil service employees. The Government also strongly contends that the interests asserted by the Union on behalf of its members are not among those which are entitled to protection under the ASPA or DAR.

There is little difficulty in determining that the employees Plaintiff represents will suffer economic harm if the Navy enters into a private contract for firefighting services. "The loss of jobs is certainly a claim of injury in fact." *Local 2677, AFGE v. Phillips*, 358 F.Supp. 60, 69 (D.D.C.1973). This loss is not mere speculation, in light of testimony that five bids received in response to the second IFB are apparently lower than NETC's in-house estimate.

The Government correctly points out that OMB Circular A–76 would require the Navy to make efforts to find suitable employment for displaced employees, and this Court assumes the Navy would do so.[2] Nevertheless, there is no guarantee that

---

**2.** Such efforts include:

(a) Requiring that a prospective contractor give Federal employees displaced as a result of the conversion to contract performance, the right of first refusal for employment openings on the contract in positions for which they are qualified;

(b) Giving them priority consideration for suitable positions with the Government;

(c) Paying reasonable costs for training and relocation when these will contribute directly to placement;

(d) Arranging for gradual transition when conversions are made to provide greater opportunity for attrition and placement; and

(e) Coordinating with the Department of Labor and other agencies to obtain private sector employment for separated workers.

OMB Circular A–76 §§ 10(a)(5) and (6)(a)–(d).

such efforts would succeed. Moreover, OMB Circular A–76 "does not create a rule of law, a private right of action, or confer any procedural benefits." *AFGE, Local 1872 v. Stetson, supra*, 86 CCH Lab Cas. at 48, 851; *see also AFGE, Local 190 v. Middendorf*, No. 75–407 (D.R.I. July 19, 1979), slip op. at 4. Since the employees Plaintiff represents would thus have no recourse if Government efforts to aid them in finding employment failed, this action may be the only one in which these employees can attempt to avoid economic loss resulting from unemployment.

The "zone of interests" test presents far more difficult problems in this action. Plaintiff has cited several cases which have held that unsuccessful bidders pass this test because their interest in ensuring the integrity of the competitive bidding process is within the zone of interests to be protected by government procurement statutes and regulations. *See, e.g., Hayes International Corporation v. McLucas, supra*, 509 F.2d at 256; *Merriam v. Kunzig, supra*, 476 F.2d at 1242; *CCTW & M v. United States Environmental Protection Agency*, 452 F.Supp. 69, 75 (D.N.J.1978). Plaintiff argues that it is "in a very real sense a competitor, just as an unsuccessful bidder would be," and that the ASPA is a statute designed to protect its interests as a competitor. In addition, Plaintiff asserts that Congress, in mandating procurement through competitive bidding in various sections of the ASPA, has demonstrated its intent to protect the public interest. Citing cases in which plaintiffs, including Unions, who have suffered "injury in fact" have been allowed to bring suit in the public interest as "private attorneys general," Plaintiff seeks to vindicate the public's interest in the integrity of the procurement process as well.

In response to these arguments, the Government contends that the procurement process is primarily intended to protect the interests of private competitors and therefore does not protect the interests of the civil service employees represented by Plaintiff. The Government further argues that the provision in OMB Circular A–76 for an informal but final administrative appeal of an agency's decision to award a private contract rather than accept an in-house estimate, and the legislative history of a recent amendment to the ASPA, indicate that Congress did not intend that employees displaced by procurement of private services might bring suit in federal district court.

At the outset, the Court is able to dispense with Plaintiff's argument that it can satisfy the "zone of interests" analysis merely by showing injury in fact plus a willingness to assert the public interest. This argument was rejected by the First Circuit in *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 402 n. 4 (1st Cir. 1977).[3] The Court can also dispense with the Government's arguments based on OMB Circular A–76. These arguments cannot defeat Plaintiff's standing, since the Circular does not have the force of law, *AFGE, Local 190 v. Middendorf, supra*, and therefore cannot override the provisions of the APA which authorize judicial review of agency action. Thus, the Court's inquiry regarding "zone of interests" is focused on the ASPA itself, the legislative history of the Act and case law construing the Act and regulations. The precise question for determination is: Whose interests is the ASPA designed to protect? If the employees Plaintiff represents are intended beneficiaries of the Act, even if not its primary beneficiaries, Plaintiff passes the "zone of interests" test. *Local 2677, AFGE v. Phillips, supra*, 358 F.Supp. at 69.

The Court has no difficulty in determining that the Act is intended to further the Government's interest in procuring financially advantageous contracts. *See Gary Aircraft Corp. v. United States*, 342 F.Supp. 473, 477 (W.D.Tex.1972). Several provisions of the Act also manifest congressional intention to benefit private competitors in general, *see* 10 U.S.C. § 2305, and small business concerns in particular, *see* 10 U.S.C. § 2301. The ASPA provides that

---

**3.** This is not to say that Plaintiff may not assert the public interest after it has otherwise satisfied the standing analysis set forth in *Data Processing. See Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972).

"[w]henever formal advertising is required .... [t]he specifications and invitations for bids shall permit such free and full competition as is consistent with the procurement of the property and services needed by the agency concerned." 10 U.S.C. § 2305. This language also appears in the Federal Property and Administrative Services Act of 1949, 41 U.S.C. §§ 251-60, in connection with which it has been held to protect "not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it." *Merriam v. Kunzig, supra*, 476 F.2d at 1242.

Although the Union did not in effect respond to a Government "invitation to do business with it" in connection with the IFB issued December 1, 1980, the effect of the NETC in-house estimate was to place Union members in competition with the employees of private contractors for the performance of firefighting services. Congress has implicitly recognized this competitive interest in a law which strengthened restrictions on conversions of commercial and industrial functions performed by civilian Department of Defense personnel to private contractors for the fiscal year 1981, the period at issue in this action. Although the primary aim of this law obviously was to assure that any such conversion would result in savings to the Government, the law nevertheless indicates some congressional concern for employees displaced by conversion to private contracts. It provides that "[n]o commercial or industrial type function ... being performed by Department of Defense personnel may be converted to performance by a private contractor" unless the Secretary of Defense informs Congress of "the potential economic effect on employees affected." P.L. 96-342, Title V, § 502(a)(2)(D)(i); *see* 10 U.S.C. § 2304 nt.

An examination of two decisions in which courts have found employees' competitive interests to be protected by statutes reveals similarities sufficient to raise an inference that the employees Plaintiff represents are arguably within the zone of interests of the ASPA.

In *Curran v. Laird*, 420 F.2d 122 (D.C.Cir. 1969), the president of the National Maritime Union (NMU), on behalf of all members of the Union, brought suit against United States officials responsible for the shipment of American military cargo. He claimed that the officials had violated the Cargo Preference Act, which provided:

> Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the [Armed Forces]. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law.

10 U.S.C. § 2631 (1964). He asserted that the Military Sea Transportation Service's use of foreign flag ships to transport American military cargo to Vietnam violated this law.

Addressing the Government's argument that the NMU did not have standing to complain about violations of the Act, the D.C. Circuit first determined that the Union members were aggrieved in fact by the use of foreign flag vessels. 420 F.2d at 124. The Court then went on to examine the statutory provisions which might arguably confer benefits on the Union members.[4] The Court found that the Cargo Preference Act was part of "a wide-ranging statutory scheme to foster American shipping," and that although the Act did not require that crews on American ships be American seamen,[5] "that did not negative the prospect

---

**4.** Although *Curran* was decided before the Supreme Court articulated the "zone of interests" test in *Association of Data Processing Service Organizations v. Camp, supra*, the *Curran* Court examined these statutes in a manner consistent with the Supreme Court approach, remarking that "the courts will entertain even an action brought by an aggrieved competitor if

there can fairly be attributed to Congress, expressly or impliedly, a purpose of protecting competitive interests like those of the complainants." *Id.* at 126.

**5.** The Court noted that Merchant Marine Act of 1936 required that American flag vessels use

that American seamen would benefit from the law." *Id.* at 127.

Several months after its decision in *Curran,* the D.C. Circuit entertained an appeal brought by another Union on behalf of its members, civil service employees affected by a reduction-in-force at a National Aeronautical and Space Administration (NASA) flight center. *Local 1858, American Federation of Government Employees v. Paine,* 436 F.2d 882 (D.C.Cir.1970).[6] In discussing the standing of the Union's members, the Court followed its approach in *Curran,* first determining that the Union members were injured economically by the reduction in force, and then examining the statute on which the action was based to see if it "reflect[ed] a legislative purpose to protect [the members'] competitive interests." *Id.* at 892. The Court pointed out that when Congress created NASA, it mandated that NASA "officers and employees shall be appointed in accordance with the civil service laws" and excepted from this mandate only 425 of the thousands of jobs created by the statute. *Id. quoting* 42 U.S.C. § 2473(b)(2) (1964). Moreover, the Court noted, Congress had rejected requests that federal salary laws be waived for all officers and employees of NASA. 436 F.2d at 892. The Court concluded that the interest in continued employment asserted by the civil servants in *Paine* was "arguably within the zone of interests to be protected" by the NASA statute's requirement that the majority of NASA employees be appointed in accordance with the civil service laws. *Id.* at 892–93, *citing Association of Data Processing Services Organizations, Inc. v. Camp, supra,* 397 U.S. at 153, 90 S.Ct. at 829.

In *Curran* and *Paine,* employees were held to have standing to challenge allegedly illegal agency action which increased competition for their jobs, placing them in economic jeopardy. Similarly, in this action Plaintiff complains that the Navy's arbitrary and capricious—and therefore ille-

gal—decision to resolicit bids increased competition for its members' jobs, placing them in economic jeopardy.

Admittedly, the statutes examined in *Curran* and *Paine* contain provisions which quite clearly indicated congressional intent to protect the competitive interests of the NMU and NASA employees. In *Curran,* the Cargo Preference Act stated a clear preference for the use of American ships which, in combination with the later requirement that seamen on such vessels be American,[7] showed a statutory preference in favor of American seamen. Likewise, the NASA statute in *Paine* showed a statutory preference for the hiring of civil service employees. Nevertheless, the absence of a specific ASPA provision which shows a preference for hiring civil service employees is not fatal to Plaintiff's argument, just as in *Curran* the absence in the Cargo Preference Act of a legal requirement that American ships be operated by American seamen did not defeat the NMU's standing.[8]

The ASPA reflects congressional intent that commercial and industrial functions of the Department of the Defense be performed at the lowest possible cost to the Government. Although the Act not only envisions but also encourages competition from the private sector, Congress has also recognized the possibility that it may be more economical for such functions to be performed in-house. To this end, Congress has mandated complete comparisons of in-house and private contracting out costs. *See* P.L. 96–342, Title V, § 502(a)(2). In the event a decision is made to retain in-house personnel because in-house performance costs the least, the decision would benefit civil service employees presently performing the function just as it would benefit the Government. Even when a decision to use a private contractor has been made, Congress has required that it be informed of the effect of the decision on in-house personnel. *See id.* at § 502(a)(2)(D)(i).

---

American crew members. 46 U.S.C. § 1132(a) (1964).

**6.** Appellants also included six individuals affected by the reduction in force. *Id.* at 884.

**7.** *See* note 5, *supra.*

**8.** *See* text at note 5, *supra.*

Viewed in this light, the provisions of the ASPA mandating "free and full competition" arguably protect the interests of civil service employees who allege that they are injured by an agency's failure to follow ASPA and DAR procurement procedures. Thus, this Court would not hesitate in holding that the employees Plaintiff represents have standing to challenge the Navy's decision to resolicit bids, were it not for an indication to the contrary in the legislative history of P.L. 96–342. The original version of section 502 contained a provision which would have permitted a government employee who received a reduction-in-force notice as a result of a conversion to file suit in United States District Court. The conference committee which approved the final version of P.L. 96–342 deleted this provision, and added the provision of section 502 which requires detailed summaries of cost comparisons for in-house and private performance to be submitted to Congress. H.Con.Rep.No. 96–1222, 96th Cong., 2d Sess., 93–94, *reprinted in* [1980] U.S.Code Cong. & Ad.News 2666, 2669.

The legislative history of section 502 does not clarify the intent of Congress in deleting the provision which would have allowed suits by government employees. In light of this ambiguity, two constructions are possible. On the one hand, the deletion of the provision might indicate that Congress did not intend that employees aggrieved by conversions to private contractors would have standing to seek judicial review. This construction finds support in the provisions in section 502 for reporting to Congress, which indicate that Congress is to participate in evaluating outside procurement decisions.

On the other hand, as Plaintiff suggests, Congress might well have deleted the provision authorizing suits by employees because it believed an explicit grant of standing to be unnecessary. This construction appears to be the more likely.

The Supreme Court has held that the Administrative Procedure Act embodied and reinforced "the basic presumption of judicial review to one 'suffering legal wrong because of agency action,'" and that "review of final agency action will not be cut off unless there is persuasive reason to believe such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967). The legislative history of the APA addresses situations in which review will be precluded:

> To preclude judicial review under this bill a statute, if not specific in withholding such review, must *upon its face give clear and convincing evidence of an intent to withhold it.* The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.

H.R.Rep.No. 1980, 79th Cong., 2d Sess., 41 (1946) (emphasis added).

There is no such clear and convincing evidence of intent to withhold review on the face of section 502, and the legislative history of the section is equivocal. Congress chose to delete a provision granting standing specifically to Government employees affected by conversion to private contracts, but chose not to deny standing explicitly. The Court therefore holds that the deletion of an explicit grant of standing in section 502 is not sufficient to defeat Plaintiff's showing that the employees it represents have suffered injury in fact to an interest arguably within the zone of interests protected by the ASPA.

The Court also finds that the Union has standing to sue on behalf of its members. The D.C. Circuit addressed this issue in *United Federation of Postal Clerks, AFL–CIO v. Watson*, 409 F.2d 462 (D.C.Cir.1969), *cert. denied*, 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969), and elaborated on it in *Paine*. Remarking that "courts have come increasingly to recognize the standing of associations to raise in some circumstances the rights of their members," the *Watson* Court determined that an association which is "an authorized spokesman organized to promote [its members'] interests" can be assumed to speak effectively for its constituency, "absent evidence to the contrary." *Id.* at 469–70. The *Paine* Court added that "[o]rganizational representation . . . is calculated to produce the intelligent, vigorous,

adversary representation of interests required" to pass the "case or controversy" requirement of Article III. 436 F.2d at 894. In both cases, the Court determined that the Union possessed characteristics sufficient to confer standing upon it. These included recognition by the agency that the Union was the exclusive bargaining agent for the employees concerned, an executive order requiring the Union to represent the employees' interests without discrimination, and Union responsibility for representing employees in grievances arising from agency decisions like the ones at issue in these cases. *Lodge 1858, AFGE v. Paine, supra,* 436 F.2d at 894-95; *United Federation of Postal Clerks, AFL-CIO v. Watson, supra,* 409 F.2d at 470.

In the instant action, Plaintiff is recognized by the Navy as the exclusive representative of all employees performing firefighting services at NETC. Collective Bargaining Agreement (Agreement) (May 16, 1980), Art. I. The Agreement gives the Union the right to be present during internal grievance procedures, and to represent employees in these procedures. Agreement, Art. IX. In addition, the Union must be consulted in connection with any proposal for reduction-in-force, and has the right to inspect NETC records pertaining to any such proposal. Agreement, Art. XXIII. These representative functions entrusted to the Union by agreement with the Navy demonstrate that Plaintiff is an authorized spokesman for its members. In fact, these functions are nearly identical to those which led the D.C. Circuit in *Watson* and *Paine* to a determination of standing. *See, e.g., Lodge 1858, AFGE v. Paine, supra,* 436 F.2d at 895 n. 81. In light of these similarities between the functions of Plaintiff herein and the Unions in *Paine* and *Watson,* the Court finds that Plaintiff's representation of the NETC firefighters, like the representation of the Unions in these cases, will ensure "that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor" to satisfy Article III. *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed. 947 (1968).

Plaintiff's vigorous representation of the NETC firefighters throughout this litigation has convinced the Court that vigorous representation is certainly not lacking. In conclusion, the Court determines that the employees presently performing firefighting services at NETC satisfy the Supreme Court's "injury in fact" and "zone of interests" analysis, and that Plaintiff is a proper representative of these interests.

It must be emphasized that the Court's conclusion that the Union has standing to challenge the Navy's decision is based on and limited to the circumstances of this action. The Court previously has recognized that a disappointed bidder has standing to challenge a government procurement decision, *see Derecktor v. Goldschmidt, supra,* and accordingly would have recognized the right of any of the private bidders for the firefighting contract to challenge the Navy's decision. In this action, NETC was in effect a disappointed bidder as well. NETC's communication with NAVFAC, Northern Division, on April 8, 1981, indicates its displeasure with the Navy's decision to issue a second IFB. As Plaintiff points out, however, NETC is an agency of the Navy, and it is unlikely that NETC would, and indeed doubtful that it could, itself challenge the Navy's decision. Consequently, the Union became the logical, if not only, party to defend the NETC in-house cost estimate as the lowest responsive "bid" submitted in response to the original IFB. This fact, coupled with the Union's allegations of injury in fact and interests within the zone of interests protected by the ASPA, establish Plaintiff's standing in this Court. Because the Court's decision is based in part on the particular relationship between the Navy and NETC, it should not be construed generally as authorizing suits by a Union representing employees of a private disappointed bidder who chooses not to challenge a procurement decision.

## THE MERITS

A "heavy burden rest[s] on anyone seeking reversal of a determination by procurement officials that there is an ambigui-

ty in a bid invitation which warrants readvertisement." *Steinthal v. Seamens,* 455 F.2d 1289, 1296–97 (D.C.Cir.1971). In attempting to prove arbitrary and capricious conduct on the part of the Navy, Plaintiff

must demonstrate a lack of reasonable or rational basis for the agency decision. This requires a showing of more than simple negligence. Either subjective bad faith on the part of the procuring official or a clear and prejudicial violation of relevant statutes and regulations is tantamount to a lack of reasonable or rational basis.

*Derecktor v. Goldschmidt, supra,* 516 F.Supp. at 1096. In determining whether a decision had a rational basis, courts "must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations," which discretion extends to "the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements." *Steinthal v. Seamens, supra,* 455 F.2d at 1301. A court is not to second-guess agency officials, and, upon a finding of reasonable basis, "should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Id.*

Plaintiff submits that it meets this heavy burden. First, Plaintiff in effect charges the Navy with bad faith, asserting that Mr. Buonaccorsi, director of the NAVFAC contracts division, intentionally failed to consider relevant information when he made the decision to cancel the IFB and readvertise because of an ambiguity in the specifications. Plaintiff also contends that, assuming there was indeed an ambiguity in the specifications, Mr. Buonaccorsi nevertheless violated the procurement regulations. Plaintiff urges that DAR, 32 C.F.R. § 2–404.1, allows a contracting officer to reject all bids and readvertise only if there is both an ambiguity in contract specifications and a compelling reason to do so, and asserts that there was no such compelling reason.

The factual background in *Steinthal v. Seamens, supra,* is very similar to the one

before this Court. The Air Force had issued an IFB for a parachute construction and delivery contract. The IFB delivery schedule contained a slippage provision which allowed contractors who could not meet the Air Force's "desired delivery" schedule to propose an alternate schedule, provided the alternate delivery dates did not extend beyond thirty days of the corresponding dates in the IFB schedule. The IFB was subsequently amended to delete the phrase "extend beyond thirty days," but the remainder of the slippage provision was retained.

Although none of the bidders responding to the IFB questioned the effect of the amendment, their bids reflected different interpretations of the delivery schedule. Of the two bidders whose bids met contract specifications, one (Pioneer Parachute Co., Inc.) interpreted the stated schedule as mandatory, while the other (M. Steinthal and Co.) interpreted the slippage provision to allow delivery within a reasonable time. The Air Force contract officer who reviewed the bids recognized that the IFB was subject to these two interpretations and found that neither was "superior." Nevertheless, he recommended award of the contract to Steinthal. 455 F.2d 1292–93.

His recommendation and findings were sharply criticized by his superior contracting officer. The superior stressed "the need to preserve a competitive bidding system by solicitations permitting competition on an equal basis," and determined that "the facts in this case present a compelling reason to reject all bids and readvertise." *Id.* at 1294. The IFB was subsequently readvertised because of the ambiguity which rendered the IFB "subject to more than one reasonable interpretation." *Id.* at 1295. Both bidders protested the resolicitation, which expressly provided a mandatory delivery schedule, but the Comptroller General denied these protests and upheld the cancellation because the first IFB represented "an inadequate expression of the Government's needs." *Id.* at 1295.

The district court ruled that the cancellation of the first IFB was arbitrary and capricious and enjoined the opening of new bids and the award of the contract to anyone other than Steinthal, finding "no basis for any new solicitation." The Court noted that the DAR allow cancellation only for "the most compelling reasons," and found that there were none. *Id.* at 1296.

In reversing this decision, the D.C. Circuit found that the district court erred in several respects. First, the lower court had failed to consider the entire administrative process, including the chain of review of procurement decisions and the expertise of the contracting officials. *Id.* at 1297–99. Second, the district court had erred in its application of the DAR to the facts. *Id.* at 1299–1300. Finally, the lower court had misunderstood the scope of review of agency action. *Id.* at 1300–06.

Because of the factual similarities, the *Steinthal* decision provides invaluable guidance to this Court in its attempt to avoid the pitfalls inherent in tackling the "technical and complex issues of interpretation of procurement regulations." *Id.* at 1292. Accordingly, the Court will consider Plaintiff's claim in light of the entire administrative procurement process, and will set aside the Navy's decision only if there was no reasonable basis for it.

Plaintiff's claims center around the decision of Paul Buonaccorsi, the NAVFAC contracting officer who made the final decision to cancel the original IFB because of ambiguity in the specifications. Mr. Buonaccorsi testified that the ambiguity in the specifications arose from the statement in the OPNAV Instruction that, although the minimum staffing requirement was four persons per station, "a five-man fire company response may be required at large high value activities." Mr. Buonaccorsi determined that because the NETC in-house estimate was based on a five-person team in two "high value areas," the Government's intent was to require five-person teams in these areas. He testified that he was concerned because the language allowing a minimum of four persons at all stations would have precluded his enforcing what he perceived to be the Government's five-person requirement against any private contractor. He concurred in Mr. Speck's opinion, expressed in the March 2, 1981 letter to GAO, that the staffing requirement was a critical component of the contract and that ambiguity regarding staffing constituted a compelling reason to cancel the bids and readvertise.

Plaintiff claims that Mr. Buonaccorsi should have looked beyond the specifications and OPNAV Instructions to RHK's bid. Plaintiff points out that since RHK's bid was based on only two persons per station, any ambiguity relating to a four-person versus five-person requirement did not prejudice RHK. Plaintiff suggests that the proper procedure would have been for Mr. Buonaccorsi to reject RHK's bid entirely, and retain in-house performance. Plaintiff asserts that this would not have prejudiced any of the other bidders, whether they bid on the basis of a four- or five-person complement, since the Government's estimate, although based on more stringent requirements, was the lowest "bid." Thus, Plaintiff argues, there was no compelling reason to cancel all bids.

Mindful of the *Steinthal* Court's admonition that courts must take into account the discretion afforded agency officials and examine their decisions in light of the entire administrative process, Plaintiff's argument must fail. Mr. Buonaccorsi is an experienced contracts officer, with eight years of experience at NAVFAC, including one year as division director. As such, he serves on a Defense Acquisition Regulations subcommittee which determines CITA policies. His testimony concerning his precise function in preparing a response to GAO concerning RHK's protest deserves some weight, in light of his experience with acquisition regulations and contract specifications like those before the Court. *See Steinthal v. Seamens, supra,* 455 F.2d at 1303–04.

Mr. Buonaccorsi testified that the specific issue before him in preparing a response to GAO was whether the IFB specifications indeed were ambiguous. The relevant information in resolving this issue was the language of the specifications and the OPNAV Instruction. He testified that the

staffing provided in the RHK bid concerned a different issue, the responsibility of RHK. Mr. Buonaccorsi testified that resolution of this issue had to await a determination whether the specifications were ambiguous. In addition, both Mr. Tanzi and Mr. Buonaccorsi testified that because RHK is a small business, the question of responsibility was one for the Small Business Administration (SBA). *See* DAR, 32 C.F.R. § 1–705.4 (1979); *see also* 15 U.S.C. § 637. Mr. Buonaccorsi could not have merely rejected RHK's bid, as Plaintiff suggests. Although he could have made a recommendation of nonresponsibility to the SBA, it would not have been binding on the SBA. Thus, viewing Mr. Buonaccorsi's decision in the context of the entire administrative process, it was not arbitrary and capricious for him to have considered only the specifications and OPNAV Instruction, along with the NETC in-house estimate which indicated to him that the Government intended to require five persons at two "high value" stations but failed to so specify. Even if Mr. Buonaccorsi had the option either to reject RHK's bid or to cancel all bids and readvertise, his decision to do the latter was reasonable in light of his belief that the Government intended to require five persons at two stations. As Mr. Buonaccorsi testified, the NETC firefighting contract was a "watch specifications" contract, in which the staffing requirement was the critical element. Assuming Mr. Buonaccorsi was correct in inferring that the Government intended to require five persons, his approval of a specification which permitted only four persons would have compromised the sufficiency of firefighting services at NETC.

Hindsight shows that Mr. Buonaccorsi was incorrect in drawing this inference.

The NETC telegram sent to NAVFAC clearly indicates that the five-person "requirement" was in fact intended to be optional. This conclusion also could have been drawn from the use of the words "may be required" in the specifications. The fact remains, however, that the specifications were capable of being construed to require five-person teams at "high value activities." This Court has previously recognized that when a bid invitation is capable of more than one reasonable construction, an agency decision to apply one of these constructions "is not irrational, and must be sustained." *Derecktor v. Goldschmidt (Derecktor I),* 506 F.Supp. 1059, 1066 (D.R.I.1980). Therefore, the Court will not set aside Mr. Buonaccorsi's decision merely because he chose one of two reasonable constructions of the specifications.

■ Furthermore, the Court finds that Mr. Buonaccorsi's decision was in accord with the ASPA. The ASPA requires "free and full competition." 10 U.S.C. § 2305. In order for competition to be valid, both the Government and the private bidders must compete on the basis of the same contract requirements. This is impossible in a situation where contract specifications not only provide that five-person teams "may" be required at "high value activities," but also fail to indicate whether the activity in question is "high value" or how such a determination is to be made. As the *Steinthal* decision demonstrates, an ambiguous provision in contract specifications does not further competition, and presents a compelling reason to cancel all bids and readvertise, even in a situation where the ambiguity might have been cleared up if contractors had asked questions about the specifications.[9] Therefore, the Court con-

---

**9.** As further grounds for setting aside the Navy's decision, Plaintiff complains of Mr. Buonaccorsi's failure to reduce his decision to writing, as required by 32 C.F.R. § 2–404.1(b). Plaintiff acknowledges that NETC was informed of the decision and its basis in a letter dated April 1, 1981, signed by Mr. Tanzi. Plaintiff asserts, however, that Mr. Buonaccorsi should have written the letter himself, and thus "would have been more likely to view the decision he was making with the seriousness it

merited and to consider all the factors before him more thoroughly before making a determination." The Court does not accept Plaintiff's argument, for two reasons. First, it appears reasonable that Mr. Buonaccorsi would direct his communication to NETC through Mr. Tanzi, who had throughout the process been the contracting officer who communicated directly with NETC. Second, assuming it was nevertheless a technical violation of the regulations for Mr. Buonaccorsi to communicate through a

cludes that Mr. Buonaccorsi's decision must stand, and judgment will enter for the Government on Count I.

## COUNTS II, III AND IV

Plaintiff's claims under Counts II, III and IV of its complaint must be dismissed for the following reasons.

■ In Count II, Plaintiff claims that the Navy breached its collective bargaining agreement with the Union, "attempting to circumvent the contract it approved only several months earlier by retaining a private firm to provide [firefighting services at NETC]." Complaint, ¶ 28. Plaintiff submits that the Agreement "clearly contemplates" that no one other than Union employees will be retained to perform such services during the three-year term of the Agreement. *Id.*, ¶ 27. As the Government points out, this claim ignores the provision in Article V of the Agreement which reserves to the Navy the right "to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted." Agreement, Art. V, § 1(b)(2). This language is identical to that of 5 U.S.C. § 7106(a)(2)(B), in which Congress sets forth authority reserved to agency management officials in bargaining with federal employees. In light of this provision in the Agreement, it cannot be said that the Agreement "clearly contemplates" that firefighting services at NETC are to be performed only by the employees Plaintiff represents.

■ In Count III of the verified complaint, Plaintiff again charges the Navy with breaching the Agreement, in this instance Article XXIII. This Article provides that the Navy will give notice "as soon as possible, in writing, to the Union, of a proposed reduction in force action, and will afford the Union an opportunity to submit its views and recommendations concerning the implementation of the proposed reduction in force." Agreement, Art. XXIII, § 1. The Government argues that this provision of the Agreement has not been triggered because no decision has been made concerning a reduction in force, and asserts that "[w]hen, and if, a reduction in force action is proposed, the Navy, as an employer, fully intends to comply with [Article XXIII]." Supplemental Memorandum at 19. The Government further states that the Union met with Navy officials on March 29, 1979, November 25, 1980 and March 4, 1981, to discuss the possibility of contracting out firefighting services.

The Court concurs with the Government's assertion that the provisions of Article XXIII have not yet been triggered. Although an internal NETC document indicates that there will be a reduction in force if firefighting services are contracted out, no definite decision regarding contracting out has been made pending this Court's decision. The Court takes the Navy at the word, and fully expects that it will comply with the Agreement when such a decision is made. Consequently, Count III is dismissed as premature.[10]

■ Similarly, the Court must dismiss Count IV of the verified complaint. In this Count, Plaintiff claims that the Navy has violated section 502 of P.L. 96–342, Title V, *supra*, because it has not yet prepared a study concerning the effect on Government employees if firefighting services are con-

---

subordinate officer, the Court finds that Plaintiff was not prejudiced thereby. As the Court has discussed at length above, Mr. Buonaccorsi's decision was reasonable, and in addition was made seriously through a consideration of all factors relevant to resolution of the GAO protest.

10. The Government contends that Counts II and III should be dismissed for failure to exhaust administrative remedies. Article IX of the Agreement "sets forth the exclusive procedure available to the parties and Unit employ-

ees for the consideration of grievances," including "[t]he effect or interpretation, or a claim of breach, of a collective bargaining agreement." Agreement, Art. IX, §§ 1 and 2(c)(1). Without deciding this question, the Court has considered the merits of Plaintiff's claims under Counts II and III, attempting to avoid delay in light of "the public interest in swift and *conclusive* resolution of challenges to public contracts." *Self-Powered Lighting Ltd. v. United States*, 492 F.Supp. 1267, 1272–73 (S.D.N.Y. 1980) (emphasis added) (Court considered merits despite lack of standing).

tracted out. Careful reading of section 502 indicates, however, that this report is to be made after the Navy has tentatively chosen a private contractor to perform the services. The report is to accompany "a detailed summary of a comparison of the cost of performance of such function by Department of Defense personnel and by private contractor" and "a certification that the Government calculation for the cost of performance of such function [in-house] is based on an estimate of the most efficient and cost effective organization for performance [in-house]." P.L. 96–342, Title V, § 502(a)(2)(B) and (C). The Navy has taken no action beyond opening the bids responding to the second IFB, and thus cannot yet have identified an apparent low bidder whose price it can compare with the Government's estimate. The Court must assume that, when such a choice is made, the Navy will comply with section 502, or any parallel provisions in public laws for fiscal year 1982.

### CONCLUSION

Although the Plaintiff has standing under Count I to contest the decision of the Navy to cancel the initial IFB and readvertise, Plaintiff has failed to meet its heavy burden in demonstrating arbitrary and capricious action on the part of the contracting officer. Plaintiff's claims under Count II are also without merit. Counts III and IV of Plaintiff's verified complaint are dismissed because they are not ripe. Judgment shall be entered accordingly.

SO ORDERED.